Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2022 08:05 AM CST

State of Nebraska, appellee, v.
Aubrey C. Trail, appellant.
___ N.W.2d ___

Filed November 10, 2022.    No. S-21-557.

1. **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.

2. **Trial: Witnesses.** It is for the trial court to determine the extent to which a sequestration order will be applied in a given case.

3. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.

4. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

5. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality of a statute presents a question of law, which an appellate court independently reviews.

6. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.

7. **Constitutional Law: Criminal Law: Jury Trials.** The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community.

8. **Constitutional Law: Juror Qualifications.** The fair-cross-section venire requirement is not explicit in the text of the Sixth Amendment,

but is derived from the traditional understanding of how an impartial jury is assembled.

9. ____: ____. The representativeness constitutionally required at the venire stage can be disrupted at the jury-panel stage to serve a State's legitimate interest.

10. **Death Penalty: Juror Qualifications.** An adequate voir dire where jurors are directly involved in sentencing in a capital case entails the opportunity to inquire into whether the views on the death penalty would disqualify prospective jurors from sitting.

11. **Juror Qualifications.** Groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors are not distinctive groups for fair-cross-section purposes.

12. **Constitutional Law: Juror Qualifications: Proof.** In order to establish a prima facie violation of the fair-cross-section requirement under the Sixth Amendment, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

13. **Juries.** An impartial jury is nothing more than jurors who will conscientiously apply the law and find the facts.

14. **Death Penalty: Juror Qualifications.** Beliefs with respect to the death penalty are within the individual's control. Death qualification does not create an appearance of unfairness, as it only results in the removal for cause of those jurors who are unwilling to temporarily set aside their own beliefs in deference to the rule of law.

15. **Death Penalty: Juries: Proof.** The State has a legitimate interest in avoiding the burden of presenting the same evidence to different juries for the guilt phase and the aggravation phase of trial.

16. **Constitutional Law: Death Penalty: Juries.** The State does not violate the Sixth Amendment right to an impartial jury by death qualifying the jury before a trial wherein it has alleged an aggravator that, if found by the jury, will make the defendant eligible for the death penalty.

17. **Equal Protection: Statutes.** When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

18. **Constitutional Law: Death Penalty.** The Eighth Amendment and article I, §§ 9 and 15, of the Nebraska Constitution are not violated by death qualification in a capital case.

19. **Constitutional Law: Trial: Joinder.** There is no constitutional right to a separate trial.

20. **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant.

21. **Trial: Joinder: Proof: Appeal and Error.** A defendant appealing the denial of a motion to sever has the burden to show compelling, specific, and actual prejudice.

22. **Trial: Joinder.** Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

23. ____: ____. Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.

24. **Conspiracy: Hearsay.** The coconspirator exception to the hearsay rule is applicable regardless of whether a conspiracy has been charged in the information or not.

25. ____: ____. Under the coconspirator exception to the hearsay rule, the declarant conspirator who partners with others in the commission of a crime is considered the agent of his or her fellow conspirators, and the commonality of interests gives some assurance that the statements are reliable.

26. **Conspiracy: Hearsay: Evidence.** Whether or not a conspiracy has been charged in the information, before the trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence, to prevent the danger of hearsay evidence being lifted by its own bootstraps.

27. **Trial: Witnesses.** The exclusion or sequestration of a witness is within the discretion of the trial court.

28. **Trial: Witnesses: Appeal and Error.** The denial of a sequestration motion will not be overturned absent evidence of prejudice to the defendant.

29. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

30. **Motions for Mistrial: Proof: Appeal and Error.** To prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

31. **Jurors: Jury Instructions: Presumptions.** Absent evidence to the contrary, the legal system presumes that jurors, to the extent they are able, will comply with curative instructions and judicial admonitions.

32. **Motions for New Trial: Statutes.** A motion for a new trial is a statutory remedy and can be granted by a court of law only upon the grounds, or some of them, provided for by the statutes.

33. **Motions for New Trial: Proof.** The asserted ground for a new trial must affect adversely the substantial rights of the defendant, and it must be shown that the defendant was prejudiced thereby.

34. **Courts: Motions for Mistrial: Motions for New Trial: Appeal and Error.** A trial court is vested with considerable discretion in passing on motions for mistrial and for a new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.

35. **Appeal and Error.** It is an abuse of discretion to make an error of law or clear errors of factual determination.

36. **Judges: Witnesses: Appeal and Error.** The trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial.

37. **Motions for Mistrial.** As a general matter, a defendant is not permitted to profit from the defendant's own bad conduct by disrupting courtroom proceedings and then urging disruption as a ground for mistrial.

38. **Criminal Law: Motions for Mistrial.** Disruptive acts of the defendant are not irremediable simply because they reflect some attribute consistent with the charged crime.

39. **Constitutional Law: Due Process: Criminal Law: Jury Trials: Proof.** The Sixth Amendment right to a speedy and public trial by an impartial jury, in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt.

40. **Constitutional Law: Statutes: Death Penalty: Aggravating and Mitigating Circumstances: Jury Trials.** Under a statutory scheme in which the death penalty cannot not be imposed unless at least one aggravating factor is found to exist beyond a reasonable doubt, the Sixth Amendment requires the factual determination of the aggravating factor be entrusted to the jury.

41. **Constitutional Law: Death Penalty: Aggravating and Mitigating Circumstances: Jury Trials.** The Sixth Amendment requires only the right to a jury determination of the death-eligibility finding of one or

more aggravating circumstances and it does not apply to the selection decision.

42. ____: ____: ____: ____. In a capital sentencing proceeding, just as in an ordinary sentencing proceeding, a jury is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range.

43. ____: ____: ____: ____. Nebraska's sentencing scheme does not violate the Sixth Amendment right to a jury trial or article I, § 6, of the Nebraska Constitution, by leaving to the three-judge panel the ultimate life-or-death decision upon making the selection decisions of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the aggravating circumstances.

44. **Constitutional Law: Sentences.** The Cruel and Unusual Punishment Clause prohibits (1) barbaric punishments under all circumstances and (2) punishments that are not graduated and proportioned to the offense.

45. **Constitutional Law: Statutes: Death Penalty: Aggravating and Mitigating Circumstances.** Nebraska's statutory scheme, delegating to the three-judge panel determinations of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the aggravating circumstances, does not violate the 8th and 14th Amendments to the U.S. Constitution or article I, § 9, of the Nebraska Constitution.

46. **Sentences: Death Penalty: Appeal and Error.** Proportionality review requires the Supreme Court to compare the aggravating and mitigating circumstances with those present in other cases in which a district court imposed the death penalty.

47. **Death Penalty: Aggravating and Mitigating Circumstances.** The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting, but, rather, requires a careful weighing and examination of the various factors.

48. ____: ____. The death penalty can be imposed when only one aggravating circumstance is present.

Appeal from the District Court for Saline County: Vicky L. Johnson, Judge. Affirmed.

Benjamin H. Murray, of Murray Law, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith, Senior Assistant Attorney General, for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## I. INTRODUCTION

The defendant was convicted by a jury of murder in the first degree and criminal conspiracy to commit first degree murder. He was also convicted, pursuant to a plea, of improper disposal of human skeletal remains. A three-judge panel sentenced the defendant to death. The defendant asserts on appeal that the three-judge panel erred in determining the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases. Alternatively, he argues Nebraska's death penalty scheme is unconstitutional because it allows a panel of judges rather than a jury to make findings of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances. The defendant also challenges the constitutionality of death qualifying the potential jurors, arguing that it creates a conviction-prone jury. Finally, the defendant challenges the denial of his pretrial motion to sever the conspiracy and murder charges, the court's release of the victim's mother from sequestration after she testified, the denial of his motion for a mistrial after a verbal outburst and act of self-harm in front of the jury, and the denial of a motion for a new trial after evidence was submitted allegedly demonstrating the self-harm would not have occurred but for the alleged misconduct of jail staff. We affirm.

## II. BACKGROUND

The State's amended information charged Aubrey C. Trail with one count of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303(1)(a) (Cum. Supp. 2020); one count of improper disposal of human skeletal remains, in violation of Neb. Rev. Stat. § 28-1301(2)(b) (Reissue 2016); and one count of criminal conspiracy to commit first degree murder, in

violation of Neb. Rev. Stat. § 28-202 (Cum. Supp. 2020). The victim was Sydney Loofe (Sydney), who was 24 years old at the time of her death on or about November 15, 2017.

The operative information gave notice that the State intended to adduce evidence of the aggravating circumstances (1) that the murder manifested exceptional depravity by ordinary standards of morality and intelligence and (2) that Trail has a substantial prior history of serious assaultive or terrorizing criminal activity. The State later removed the notice of second aggravator.

As part of his trial strategy, Trail pled no contest to the improper disposal of human skeletal remains. His plea was accepted prior to the beginning of the jury trial on the remaining two counts. The theory of the defense was that Trail was involved in a consensual sexual relationship with a group of women. This group always included Bailey Boswell, with whom Trail lived. The group also at various points included Ashley Hills, Anastasia Golyakova, and Kaitlyn Brandle. The defense argued that because Hills and Golyakova had recently left the group, Trail was hoping Sydney would become a new member. According to the defense, Sydney was interested in joining the group and was accidentally killed while the recipient of consensual erotic asphyxiation. Trail then panicked and dismembered and disposed of Sydney's remains.

## 1. Jury Selection

Before trial, defense counsel moved to "prevent death qualification of the jury." In the motion, defense counsel objected to any mention—in the jury questionnaires, during jury selection, or during the trial of guilt or innocence—of the possible sentences Trail might receive. Defense counsel asserted that informing the jury of the possible penalty of death is unnecessary and results in excluding those jurors who cannot perform their duties because of their beliefs on the death penalty. According to defense counsel, this process results in those charged with capital offenses being unjustifiably subjected to

conviction-prone juries, which violates equal protection under the 14th Amendment to the U.S. Constitution and article 1, § 3, of the Nebraska Constitution; the right under the 6th Amendment to the U.S. Constitution to a fair and impartial cross-section of jurors; and the right to heightened reliability in capital cases as protected by the 8th Amendment to the U.S. Constitution and article I, §§ 9 and 15, of the Nebraska Constitution.

As is relevant to this appeal, defense counsel asserted that "empirical research has demonstrated that the systematic exclusion of jurors who have a moral objection to the death penalty results in capital juries that tend to be . . . more conviction-prone" and that these views are not representative of a fair cross-section of the community. Further, asking jurors about their views on the death penalty magnifies the effect of conviction-prone beliefs. While defense counsel acknowledged that the U.S. Supreme Court, in *Lockhart v. McCree*,[1] rejected a claim that the process of death qualification violates the fair-cross-section requirement of the Sixth Amendment and the right to an impartial jury, defense counsel cited in the written motion to various articles describing additional studies in the 30-plus years since *McCree*, indicating the process of death qualification creates conviction-prone juries. No testimony or other evidence was adduced in support of the motion.

Defense counsel stated that the justification for death qualification presupposes a statutory scheme in which a single jury determines both the guilt and the penalty. Defense counsel argued that because in Nebraska, the jury does not determine the sentence in the penalty phase, informing the jury of the possible sentence of death serves no legitimate purpose. Accordingly, a potentially conviction-prone jury created by death qualification cannot pass the heightened scrutiny allegedly applicable to this conviction-prone classification of jurors.

---

[1] *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

The court overruled the motion and proceeded with voir dire. During voir dire, defense counsel renewed the objection to "the death qualification of each individual juror during jury selection." The renewed objection was overruled.

Juror questionnaires and the judge's statement from the bench during voir dire informed the potential jurors that the charges Trail faced could result in the death penalty. The judge explained that the sentence itself would be determined by a panel of judges, but that if Trail were found guilty of first degree murder, the jurors would be asked to listen to some more evidence and determine if the State had proved additional elements, after which their duty would be done and the matter would go to the panel of judges for sentencing.

During the jury selection process, jurors Nos. 104 and 126 stated in chambers that their views against the death penalty would impair their ability to be fair and impartial. Both jurors were struck for cause on the State's motion. Defense counsel did not object to them being excused.

Jurors Nos. 23, 60, 78, 245, 261, and 275 were struck for cause on defense counsel's motion because they indicated their belief in Trail's guilt would interfere with their ability to be fair and impartial.

Jurors Nos. 108, 113, and 262 indicated they did not believe in the death penalty but could perform their factfinding duties in a fair and impartial manner. Jurors Nos. 113 and 262 were subject to peremptory challenges, but juror No. 108 was not.

## 2. Motion to Sever Murder and Conspiracy Charges

Defense counsel moved pursuant to Neb. Rev. Stat. § 29-2002 (Reissue 2016) to sever the trial on the murder charge from the other charges. As relevant to this appeal, defense counsel asserted joinder would prejudice Trail because evidence admissible in support of the conspiracy charge would not be admissible in support of the murder charge, if those two charges were tried separately. Defense counsel explained there would be no evidence proving the conspiracy that would

be truly independent of the murder charge. Defense counsel believed that, because of this, there could be no prima facie case through independent evidence establishing the existence of the underlying conspiracy, which is necessary to admit testimony under the coconspirator exception to the hearsay rule. The defense argued the State was trying to introduce hearsay evidence to establish a conspiracy, with its more flexible hearsay rules, and then use that conspiracy to permit the introduction of otherwise inadmissible hearsay testimony into evidence to support the murder charge.

The State responded it intended to establish, without "impermissible hearsay," a prima facie case of conspiracy, before attempting to introduce evidence under the coconspirator exception to the hearsay rule. The evidence to establish the conspiracy, explained the State, would primarily consist of the testimony of Hills, Golyakova, and Brandle, all of whom Trail had tried to convince to participate in a murder. The State asserted their testimony would be admissible as evidence of premeditation on the murder charge and would be introduced into evidence even if the trial of the conspiracy count were not joined with the murder count.

The court overruled the motion to sever. However, it warned the State that "it needs to structure its case to avoid the bootstrapping problems and that I will be keeping an eye on the case as it proceeds."

### 3. Sequestration and Release
### of Sydney's Mother

Before trial commenced, the court granted defense counsel's motion to sequester witnesses. Sydney's mother was the first witness to testify at trial. After being cross-examined by defense counsel, the State asked that Sydney's mother be released from her subpoena. The State said it would waive sequestration and would be willing to allow the defense to call Sydney's mother out of turn if it wished, so that Sydney's mother could be present to watch the remainder of the trial.

Defense counsel objected. Following a discussion in chambers that was not on record, the court pronounced that it was releasing Sydney's mother from sequestration but would allow the defense to reopen its cross-examination if it wished to do so. Sydney's mother was not recalled to testify by either party after being released from sequestration.

### 4. Evidence Adduced at Trial

At trial, evidence was adduced that Trail and Boswell moved into a basement apartment in Wilber, Nebraska, in June 2017. They had been in a romantic relationship since the summer of 2016. To make money, they sold stolen goods, including sales at a local antiques market.

### (a) Sydney's Contact With Trail and Boswell in November 2017

In November 2017, Boswell posed as "Audrey" on an online dating application (dating app). Boswell began messaging with Sydney on November 11 and learned that her family lived hours away from where Sydney lived in Lincoln, Nebraska. She also learned that Sydney worked as a store clerk at a Lincoln hardware store. Sydney and Boswell arranged a first date on November 14. Text messages between them are consistent with arranging a first date. Neither Trail nor any other third party is mentioned in the text messages.

Sydney initially delayed giving Boswell her address, but upon further request on the evening of November 13, 2017, provided it. Within 1 minute of obtaining the address, Boswell conducted an internet search for its location. Within 5 minutes of obtaining that information, Boswell made a reservation at a hotel nearby.

Trail and Boswell checked into that hotel before the first date. After a couple of hours on their first date, Boswell returned Sydney home. Sydney did not go to the hotel. Boswell joined Trail at the hotel, where they again spent the night.

Sydney had accepted a second date with Boswell to occur on November 15, 2017. On the morning of November 15,

Trail and Boswell left the hotel and went to a hardware store where they purchased dropcloths, a hacksaw, blades, and tin snips.

Cell phone location information indicated that around the time Sydney would have left for work, Trail and Boswell drove to the vicinity of Sydney's apartment. Trail and Boswell then took the same route Sydney took to work.

Shortly after Sydney started her shift, Trail entered Sydney's workplace alone. Video footage showed that as Sydney walked toward her station at the "guard shack," she crossed paths with Trail, who was walking into the store. Trail did not interact with Sydney, and she did not appear to recognize Trail. As Sydney walked away, Trail turned around twice to watch her. Trail then called Boswell. Trail proceeded into the hardware store where he purchased a chemical drain cleaner and a long cord.

Cell phone location information showed that Trail and Boswell went back to their Wilber apartment while Sydney was at work. While in Wilber, Boswell made two trips to local stores. On the first trip, she purchased bleach and large trash bags. Later, she purchased duct tape and roasting pans.

Throughout the day, Boswell texted Sydney to ask how her day was going and communicate that she was looking forward to their date. Sydney left work at the end of her shift on November 15, 2017. Boswell left the Wilber apartment around 6 p.m. and picked Sydney up at her apartment around 6:54 p.m.

Trail was at the Wilber apartment. Boswell called Trail at 7:11 p.m. Cell phone location information indicated that Sydney arrived at Trail and Boswell's apartment at approximately 8 p.m. on November 15, 2017, and that both Trail and Boswell were present at the apartment at that time. The cell tower lost all signal from Sydney's phone at 8:40 p.m.

A resident of the apartment building where Trail and Boswell lived smelled bleach late that night. The smell of bleach was

so strong that the following day, another resident of the building became ill from it.

Sydney did not report to work the next day. She was never seen alive again.

### (b) Disposal of Sydney's Body and Cause of Death

Cell phone location information indicated that Trail and Boswell left their apartment the afternoon of November 16, 2017, and traveled to an area in Clay County. On December 4 and 5, after tracing Trail's and Boswell's cell phone location information, most portions of Sydney's body were found in a ditch in the area Trail and Boswell had traveled to on November 16. The remainder of Sydney's body, including most of her internal organs, was never found. Law enforcement also found duct tape, tarps, a sauna suit with the crotch missing, gloves, and various items of clothing in the vicinity.

Sydney's body had been segmented into 14 parts and placed into garbage bags. An autopsy revealed the manner of death to be homicidal violence that included an element of strangulation. The hyoid bone in the neck had been crushed, there was a scleral hemorrhage in one of her eyes, and there was petechiae, or "little hemorrhages," throughout the face, including in the eyelids and under the eyelids. Scleral hemorrhages and petechiae are due to an occlusion of blood flow and consistent with either manual or ligature strangulation. When asked whether these signs are "very common in strangulation cases," the expert responded, "Yes. Manual strangulation, yes."

Expert testimony introduced by the State reflected that strangulation due to erotic asphyxiation is rare and that a fracture of the hyoid bone, which resides deep in the neck tissue, is very uncommon during erotic asphyxiation. Sydney's body also showed indications that around the time of death, she experienced blunt force trauma. This included bruises on the back of the head and down the middle of her back and a deep

bruise into the muscle of her inner thigh. Around the time of her death, Sydney also suffered a torn earlobe around a piercing site. Abraded contusions around Sydney's wrists revealed evidence of restraints.

The autopsy was complicated by the absence of most of the organs of Sydney's torso and abdomen, as well as the absence of other body parts, such as the upper part of the trachea, windpipe, larynx, and veins and arteries of the neck. These appeared to have been removed post mortem by use of a sharp blade. The pathologist did not believe the mutilation of Sydney's body was due to animal predation.

In an interview with law enforcement after he was apprehended, Trail spoke of draining Sydney's blood from her body and being "very thirsty that day." Numerous superficial post mortem shallow cuts were found on Sydney's body. These included cuts underlining and framing a tattoo on Sydney's arm reading, "Everything will be wonderful someday."

### (c) Hills', Golyakova's, and Brandle's Relationships With Trail and Boswell From July to November 2017

Before they were called individually to testify, defense counsel objected at trial to the introduction of the deposition testimonies of Hills, Golyakova, and Brandle on the grounds that the State had failed to establish a prima facie case of a conspiracy through independent evidence. The State responded that evidence had already been adduced of overt acts of the conspiracy, such as online dating recruitment, the purchases at the hardware store the day before the murder, staying at the hotel, driving by Sydney's apartment and observing her at work, and the cell phone evidence linking Trail and Boswell to Sydney's murder. The State explained that Sydney's murder was part of an overarching conspiracy beginning in July 2017 to kill someone, and to continue killing.

The court ruled that the State had not yet established a prima facie case for a conspiracy through independent evidence.

After that ruling, the State introduced, without objection, physical evidence that Golyakova and Brandle had been inside the Wilber apartment. The State also introduced the testimony of law enforcement that its investigation had linked Golyakova to several stays with Trail and Boswell at a hotel in Falls City, Nebraska, between July and October 2017. The State then adduced Hills' testimony.

*(i) Hills' Testimony and Prima
Facie Case of Conspiracy*

Without objection, Hills testified that she met Boswell through an online dating app in July 2017 and that she met Trail through Boswell. Boswell used an alias.

Trail told Hills that he could help her get revenge on an abusive stepfather. He invited Hills to become 1 of 12 other women he claimed were associated with him, whom he referred to intermittently as "his girls" and "witches." Trail showed Hills nude photographs of the alleged witches, but she never met any of them. Boswell was the "queen witch." Trail claimed to be a vampire.

In August 2017, Hills was introduced to Golyakova as a person who Trail said might become "one of us" as a "watcher." Trail told Hills that she could leave his "coven" at any point until she took her first "soul," which she understood meant to kill someone and "take their last breath."

Hills believed Trail. She continued to associate with Trail and Boswell. She was sexually involved with both. Their sexual activities involved erotic asphyxiation. Hills had to follow various rules that Trail set for her behavior, such as having to check in every 3 hours while away from the Wilber apartment, remaining unclothed while in the apartment, and having to ask permission to do anything, even to use the restroom or get a drink of water. If she did not follow these rules or otherwise misbehaved, she was physically punished by being hit, whipped, or choked. Trail paid her an allowance. Hills also assisted in selling antiques.

Hills described a process she observed a few times where Boswell would start talking to a woman she met through a dating app and then hand off the communication with that woman to Trail. If the woman wanted to talk on the phone, Trail would give the phone to Boswell after giving her a summary of prior text communications.

Hills stated that in August 2017, while at a grocery store, Boswell briefly met with a woman she had been communicating with in that manner. Boswell directed the woman to go speak with Trail. Trail and the woman spoke for a while before Trail, Boswell, and Hills left the store. Hills testified that Trail asked her afterward if she wanted that woman to be her "first kill." While Hills responded in the affirmative, she was told a couple of weeks later that the woman had traveled to California to visit family. Trail told Hills they "would either save her for another time or find someone else."

Trail, Boswell, Hills, and Golyakova went on a vacation together that August. Shortly thereafter, Trail stated that he wanted to kill Golyakova. Trail explained Golyakova was too nice and "didn't have the evil in her." A plan was discussed to do so, but never executed. Trail threatened Hills that he would kill her family if she ever disclosed his plans.

Hills stated that Trail often spoke of torturing and killing someone and said that causing pain to someone would make the killer more powerful. Trail was aroused by the idea of watching her and Boswell torture someone. He told Hills he wanted the idea of torturing someone to be arousing for her and Boswell too. Trail asked Hills to think about ways she would torture her victim.

In September 2017, Hills told Boswell she wanted out. Among other reasons, she did not want to kill Golyakova. Hills moved to another town and had only sporadic contact with Trail and Boswell thereafter.

During a break in Hills' testimony, the court found in chambers that the State had provided sufficient evidence to prove a prima facie case of conspiracy and that "it may now get into

the statements of . . . Boswell." Defense counsel asked if "when we start getting into the hearsay," it could have a continuing objection after making the first objection. The court granted the continuing hearsay objection, which defense counsel explained would be for any statements attributable to Boswell.

Hills resumed her testimony. She stated that Trail once showed her Boswell's "killing bag." He had pulled out a hammer, some pliers, and a sauna suit from the bag and showed them to her. Trail told Hills she would get her own killing bag "when it was time." Trail said the sauna suit was so that they would not get blood on themselves.

### (ii) Golyakova

Golyakova testified at trial that in the late summer of 2017, she met Boswell through a dating app. Boswell initially used an alias. She was later introduced to Trail by Boswell, who explained they were in an "open relationship." She eventually entered into a relationship with Trail and Boswell that was somewhat similar to Hills', but Boswell was in charge of punishing her. Also, erotic asphyxiation was apparently not involved. Golyakova soon told them she was not comfortable with some of the rules, after which she no longer had to follow them. Golyakova did household chores and assisted in the antiques enterprise. Golyakova testified that she liked the idea of someone taking care of her.

Trail spoke to Golyakova about having a coven and special powers, but she did not believe him. Golyakova testified that Trail and Boswell eventually started talking to her about whether she would be willing to torture and kill someone. They told her they wanted to make videos of people being tortured, which they could sell. Trail and Boswell told Golyakova that they could make $1 million, split it, and go their separate ways. They sometimes also discussed murdering someone in a certain manner, "like for sacrifices or something." Trail and Boswell assured Golyakova that their victim would be someone who had done bad things. Golyakova said

she was not comfortable hurting anyone, and she left the group in October.

### (iii) Brandle

Brandle testified at trial that she met Boswell through a dating app in October 2017. Boswell used an alias. Brandle entered into a relationship with Boswell similar to the others, except she was more focused on having a romantic relationship with Boswell and did not want anything from Trail. She understood that she was entering into a dominant-submissive relationship and that Trail was part of a "package deal," but testified that there was no mention of choking. She had not been in a dominant-submissive relationship before, but she wanted to be with Boswell and decided to "give it a shot." She did not get directly involved in their antiques enterprise.

Brandle said there was some discussion of witches. Trail told her that she was Boswell's "familiar" and that they had known each other in past lives. Trail also mentioned having a coven of witches that she would meet someday. Trail told Brandle she could ask for one wish, but she "would have to pay the price." Brandle explained that she was skeptical and did not pursue that line of discussion. She was never told what the "price" would be.

On November 13, 2017, Boswell complained about another woman she claimed was stalking her and asked Brandle if she would ever "kill for her." During intercourse, while Trail watched, Boswell asked Brandle if there was anyone she "wanted to kill." Boswell also asked Brandle to describe ways someone could torture someone else. When the intercourse became uncomfortable and Brandle wanted to stop, Trail told her that it would stop if Brandle told Boswell what she wanted to hear. Brandle testified that she tried to describe "torture techniques" from the "Renaissance era" that she recalled learning about in school.

Brandle suffered an asthma attack and went back to her home in Omaha, Nebraska. On the morning of November

15, 2017, while Boswell was in the hardware store, Boswell texted Brandle that she would be busy for the next couple of days.

Brandle testified that she did not see Trail or Boswell again until the afternoon of November 17, 2017. Brandle described that on November 17, Trail and Boswell seemed quieter and more tense than usual. Trail and Boswell picked Brandle up, and they went to a hotel casino. Boswell showed Brandle a picture of a young woman whom she identified as her stalker and asked Brandle to participate in her murder. Brandle initially declined, but she accepted the proposition after Trail made various threatening statements.

After participating in arrangements to leave Boswell's car in a store parking lot and taking a cab back to the hotel with the idea that they would be using Brandle's car for the supposed murder they were planning, Trail told Brandle she did not have to worry about participating anymore, because she had already proved her loyalty. Trail and Boswell then convinced Brandle to drive them across Nebraska for a supposed drug deal. Brandle testified that Trail and Boswell continued to seem tense and appeared to have quiet arguments.

Brandle testified that eventually either Trail or Boswell suggested they were going to find someone to torture and kill, as a way to make money. On November 21, 2017, during intercourse at a hotel room, Boswell again asked Brandle to talk about how people could be tortured. Brandle talked about the same historical torture methods she had the previous time. Boswell talked about dismembering people.

On November 22, 2017, Trail and Boswell had Brandle drive them to Kearney, Nebraska. Trail and Boswell explained they intended to find, as a victim, an exchange student who was still around during the Thanksgiving holiday. Their thinking, Brandle explained, was that such a victim would be unlikely to be immediately missed. The idea was that Boswell and Brandle would torture and murder the victim while Trail watched. Brandle stated she tried to stay calm and

cooperative because she believed that her family would be hurt if she did not.

When a law enforcement officer left a voicemail on Brandle's phone and Trail was informed of that fact, they all left Kearney without any further action toward attempting to identify a potential murder victim. At that point, Trail and Boswell told Brandle that a young woman was missing and that Boswell was being falsely blamed because she was the last person seen with the woman. Boswell cried and insisted she did not hurt the missing woman.

Trail and Boswell eventually dropped Brandle off at a hotel close to her home after Brandle learned from law enforcement that her mother had filed a missing person report on her. Brandle's mother also informed her that her father was gravely ill. Brandle told Trail and Boswell she wanted to return home.

### (d) Trail's Testimony

Trail testified in his own defense. He stated at the outset that he did not contest 85 percent of the prosecution's case. Trail said that in Trail and Boswell's apartment, he and the women he was involved with could talk about anything, "from the mildest to the wildest" and "what you were is what you were." He and Boswell were not going to tell anyone they were "wrong about anything." He acknowledged "there was a lot of talk in our house about killing people, torturing people." Trail claimed these were just fantasies.

Trail admitted that much, albeit not all, of his inspiration in his discussions of these fantasies came from a book of fiction about witchcraft where the characters torture people for power. He did not believe this was true but thought the women were interested in the discussions. Other discussions about reincarnation and "spiritual" witches and vampires reflected his personal beliefs.

Trail claimed that he met Sydney in the spring of 2017 while she was working at the hardware store and that

Boswell met her about a week later. Trail described that Sydney and Boswell developed a romantic relationship and that Sydney was paid for participation in Trail's illegal moneymaking schemes. Sydney ended her arrangement with Trail in September 2017.

Trail testified that in November 2017, Boswell asked Trail if she could reach out to Sydney through the dating app she was on. Sydney was upset when Boswell picked her up for their first date and Sydney realized who her date was. But Boswell convinced Sydney to consider "coming back and being with us," and they arranged a second date. Trail described the items purchased on November 15 as intended for the repair and cleaning of antiques.

According to Trail, Sydney went to the Wilber apartment on the evening of November 15, 2017, to discuss the possibility of rejoining the group. During that conversation, Trail asked Sydney to either answer or turn off her phone. Sydney turned off the phone.

Trail testified that Sydney eventually agreed to experiment that night with erotic asphyxiation wherein Trail would hold a cord connected to a ligature while Sydney and Boswell engaged in sexual intercourse. And during these activities, Sydney appeared to have a seizure, stopped breathing, and died. Trail said he did not intend to kill Sydney. He explained that doing so would be "counter-productive," because he used people for sex and to make money.

Trail testified he did not call an ambulance because he had an extensive criminal history and had illegal drugs and stolen goods in the apartment. He dismembered Sydney's body as a means of fitting it into a trunk to remove it from their apartment without being noticed. He denied removing Sydney's internal organs. He dumped the trash bags containing Sydney's body in the location where they were eventually discovered by law enforcement.

Trail described fleeing with Brandle's assistance, claiming that looking for an exchange student as a potential victim

was simply part of a fantasy they never intended to act upon. Likewise, he claimed the prior discussion with Hills about killing the woman he met at a store was just a fantasy. In fact, Trail claimed he told Hills the woman had moved to California "[b]ecause the crazy bitch wanted to kill her." He said he was afraid she would actually do it and wanted to prevent that from happening.

## 5. Courtroom Disruption

The trial lasted approximately 3 weeks. On the third day of trial, around 10:30 a.m., after a witness was sworn in but before she testified, Trail, seated at the counsel table, yelled, "[Boswell] is innocent, and I curse you all."

Immediately thereafter, Trail made a couple of slashing gestures at his neck. Some blood was visible. Trail had secreted a razor blade into the courtroom and had used it to inflict wounds to his neck. The jury was immediately cleared from the courtroom, and law enforcement and medical personnel took over.

The judge told counsel that trial would be reconvened after the jury was instructed to "disregard the outburst." Defense counsel moved for a mistrial, arguing the jury would be prejudiced against Trail in determining the aggravator of having a history of serious assaultive or terrorizing criminal activity. The court stated it would determine whether a mistrial was warranted after individually interviewing the members of the jury.

The court instructed the jury "to disregard the outburst that you heard this morning and to not consider it in your deliberations at the end of the trial." Thereafter, each juror was individually questioned by the trial judge in chambers with counsel present. The court generally asked each juror if the juror had heard the curative instruction and believed he or she could remain fair and impartial and follow that instruction. Several jurors were asked if the events of the day affected their ability to remain a fair and impartial juror.

Each juror assured the court that he or she could remain fair and impartial. The court directed each juror to bring it to the court's attention if the juror later came to the conclusion that the juror could no longer be fair and impartial. None ever did.

The court overruled the motion for mistrial.

## 6. Motion for New Trial

The jury found Trail guilty of first degree murder and of conspiracy to commit first degree murder. After the verdict, defense counsel moved for a new trial on the grounds that Trail was prevented from having a fair trial due to the court's rulings on several issues. However, Trail has only appealed the denial of his motion as related to defense counsel's motion for mistrial following Trail's verbal outburst and act of self-harm.

With respect to Trail's disruption in front of the jury, defense counsel argued that, but for a lack of security measures, the incident could have been prevented. This negligence, argued defense counsel, "contributed to the severity of the event and elevated it to the level that required a mistrial." Defense counsel also argued that the act of violence prejudiced the jury against Trail inasmuch as it was contrary to the argument that Trail was incapable of violence.

While the court's ruling was pending, the State moved to adduce additional evidence that it argued would show Trail's actions were calculated to disrupt the trial. The State asked that the evidence be under seal, as it involved law enforcement intelligence, courtroom security, and officer safety. Defense counsel responded that he did not object and was tentatively planning on offering the same or similar evidence as newly discovered evidence in support of the motion for new trial. At a later date, several exhibits were marked, offered, and received under seal.

The court ultimately denied the motion for new trial, observing that Trail had not produced any evidence that the act of

self-harm prejudiced him. The court found that the self-harm was "a calculating gesture resulting in superficial cuts."

### 7. Constitutionality of Panel Findings of Sufficiency and Relative Weight of Aggravating Circumstances

After the verdict, defense counsel waived Trail's right to a jury for the aggravation sentencing phase. Defense counsel then moved to declare Nebraska's death penalty statutes unconstitutional, in violation of the Sixth and Eighth Amendments to the U.S. Constitution and articles 1 through 6 of the Nebraska Constitution. Defense counsel asserted that the sentencing panel's factual findings regarding the relative weight of the aggravating and mitigating circumstances are facts increasing the penalty for a crime beyond the prescribed statutory maximum and must, therefore, be submitted to a jury. Defense counsel also argued that Nebraska is an "outlier" by permitting the determination of the death penalty to be made by a judicial panel, rather than a jury, and that the "noticeable trend away from judicial death sentencing" is strong evidence that society does not regard such a procedure to be proper or humane. Finally, according to defense counsel, a determination by a jury of the relative weight of the aggravators and mitigators is necessary to satisfy the Eighth Amendment's heightened reliability standards for capital punishment because the consensus of 12 jurors is less arbitrary and better expresses the conscience of the community on the ultimate question of life or death. The trial court treated the motion as a motion to quash and ultimately found that it lacked merit and denied it.

### 8. Sentencing

Pursuant to Neb. Rev. Stat. § 29-2521(2) (Cum. Supp. 2020), a sentencing hearing before a three-judge panel was held. The panel found the State had proved beyond a reasonable doubt the aggravating factor that the murder manifested exceptional depravity by ordinary standards of morality and intelligence.

This was supported by the fact that Sydney's murder reflected cold, calculated planning beyond the mere premeditation necessary to support a conviction of first degree murder.

The panel also found to be present four out of the five factors for a finding of exceptional depravity: (1) apparent relishing of the murder by the killer, (2) infliction of gratuitous violence on the victim, (3) needless mutilation of the victim, (4) senselessness of the crime, or (5) helplessness of the victim.[2] The panel explained that the mutilation of Sydney's body made it impossible to determine if Trail had inflicted upon Sydney gratuitous violence beyond that necessary to inflict death, but all of the other four factors were present. First, Trail's actions before and after the murder demonstrated he relished the act, having no regard for Sydney's life beyond his own pleasure. Second, the needless mutilation of Sydney's body demonstrated that Trail had a mental state "senselessly bereft of any regard for human life." Third, noting that Sydney posed no threat to Trail and Boswell, had no idea she was being led to an encounter with a "man twice her size," and was unable to defend herself or seek help at the time of the murder, the panel found that Sydney was a helpless victim. For similar reasons, the panel found that her murder was completely unnecessary and senseless. Further, the panel found that Trail had the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

The panel found no statutory mitigating factor or circumstances existed. The only statutory mitigating factor alleged by Trail was that the "victim was a participant in the defendant's conduct or consented to the act," as set forth in Neb. Rev. Stat. § 29-2523(2)(f) (Cum. Supp. 2020). The panel found this mitigating circumstance did not exist.

As a nonstatutory mitigating circumstance, the panel recognized Trail's bad childhood and disadvantaged upbringing. His parents left him when he was 2 years old, after which

---

[2] *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

time he lived for several years with grandparents who "had a poor attitude toward the law." When his mother later married, Trail was adopted by his stepfather, who was abusive. Trail spent his teenage years in troubled environments, including a juvenile detention facility. He was incarcerated for the first time at age 17 and has spent most of his life incarcerated or on parole.

In weighing the aggravating circumstance against the existing nonstatutory mitigating factor, the panel found that—given the degree of cold, calculated planning; the relishing of the murder; and the mutilation of the victim, all demonstrating an "extreme depravity in the mind of . . . Trail"—the aggravating circumstance was entitled to great weight. The panel found the weight of the nonstatutory mitigating circumstance of Trail's bad childhood and disadvantaged upbringing "does not approach or exceed the weight of the overwhelming evidence supporting the aggravating circumstance of exceptional depravity found in this case."

Finally, the panel found in its review under Neb. Rev. Stat. § 29-2522(3) (Cum. Supp. 2020) that the sentence of death would not be excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. It noted cases such as *State v. Torres*,[3] *State v. Joubert*,[4] *State v. Moore*,[5] and *State v. Williams*.[6]

For his conviction of first degree murder, the panel sentenced Trail to death. The presiding judge sentenced Trail to 2 years' incarceration for the improper disposal of human skeletal remains and to 50 years' incarceration for conspiracy to commit first degree murder, both to run consecutively to the murder conviction. Trail, represented by trial counsel, appeals.

---

[3] *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[4] *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986).

[5] *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982).

[6] *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

## III. ASSIGNMENTS OF ERROR

Trail assigns that the district court erred in (1) "death qualifying" the jury; (2) denying his pretrial motion to sever; (3) allowing an identified witness to remain in the courtroom during trial, in violation of the court's own sequestration order; (4) denying his motion for mistrial; and (5) denying his motion for new trial. He also assigns that the sentencing panel erred when balancing the aggravating circumstances against the mitigating circumstances and by concluding that his case merits death when compared to similar cases. He asserts that Nebraska's death penalty statutory scheme violates the Sixth and Eighth Amendments to the U.S. Constitution and articles 1 through 6 and 1 through 9 of the Nebraska Constitution, because it permits judges, not juries, to make the factual findings necessary to impose death sentences.

## IV. STANDARD OF REVIEW

[1] A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[7]

[2] It is for the trial court to determine the extent to which a sequestration order will be applied in a given case.[8]

[3] An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.[9]

[4] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[10]

---

[7] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[8] *State v. Swillie*, 218 Neb. 551, 357 N.W.2d 212 (1984).

[9] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[10] *State v. Hairston*, 298 Neb. 251, 904 N.W.2d 1 (2017).

[5] The constitutionality of a statute presents a question of law, which an appellate court independently reviews.[11]

[6] In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.[12]

## V. ANALYSIS

On direct appeal, Trail challenges the denial of his pretrial motions to prevent death qualification of the jury and to sever the conspiracy and murder charges. He argues that the district court erred during trial by releasing the victim's mother from sequestration after she testified and by denying his motion for a mistrial based on his verbal outburst and self-harm. He asserts that, after trial, the court erred in denying his motion for a new trial based on that same incident. Finally, Trail asserts the Nebraska death penalty statutes under which he was sentenced are unconstitutional. Alternatively, he asserts the three-judge panel erred in determining the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases. We address each of these arguments in turn.

### 1. Death Qualification

Trail argues the district court abused its discretion in informing the venire the death penalty was a potential sentence, which led to questioning potential jurors about their ability to remain fair and impartial despite their views on the death penalty, which led to removing jurors for cause when they could not remain fair and impartial. In other words, he challenges the death qualification of the jury.

Trail asserts the exclusion of prospective jurors who were opposed to capital punishment subjected him to a trial before

---

[11] *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

[12] *State v. Schroeder*, 305 Neb. 527, 941 N.W.2d 445 (2020).

a more "conviction-prone"[13] jury than he would have had without death qualification. He does not necessarily take issue with the premise that views on capital punishment can interfere with certain potential jurors' ability to perform their duties, but claims death qualification is unnecessary in Nebraska because jurors do not impose the sentence. He claims the jury can remain unbiased without death qualification because "it is possible to keep the issue of the death penalty out of the jurors' minds all together."[14]

While Trail acknowledges Neb. Rev. Stat. § 29-2006(3) (Cum. Supp. 2020) states that having opinions "such as to preclude [a juror] from finding the accused guilty of an offense punishable with death" is good cause to challenge the juror, he describes this as a "relic from a time period in Nebraska history during which it was widely known that the penalty for murder was a mandatory death sentence."[15] Trail asserts unnecessary death qualification violates the heightened reliability standard applicable to capital cases under the 8th Amendment to the U.S. Constitution and article I, §§ 9 and 15, of the Nebraska Constitution; equal protection principles embodied in the 14th Amendment to the U.S. Constitution and article I, § 3, of the Nebraska Constitution; and the 6th Amendment right to a jury trial.

(a) Sixth Amendment

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." The 6th Amendment is applicable to the States through the 14th Amendment.

---

[13] Brief for appellant at 20.

[14] *Id.* at 16.

[15] *Id.* at 17-18.

[7-9] The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community.[16] The fair-cross-section venire requirement is not explicit in the text of the Sixth Amendment, but is derived from the traditional understanding of how an "impartial jury" is assembled.[17] The Constitution presupposes that a jury selected from a fair cross-section of the community is impartial.[18] The "'representativeness'" constitutionally required at the venire stage can be disrupted at the jury-panel stage to serve a State's "'legitimate interest.'"[19]

The U.S. Supreme Court has produced a body of case law under the Sixth Amendment holding the State has a legitimate interest in death qualifying juries that are directly involved in capital sentencing. It has not addressed death qualification outside of that context.

The Court has expressly declined to conclude, as a matter of judicial notice or on the records presented to it, that, in the conviction phase of trial, the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.[20] Even assuming without deciding death qualification "'slants'"[21] the jury in favor of conviction, the Court has repeatedly held it serves a proper purpose to exclude jurors whose views on capital punishment interfere with their ability to obey their oath during the sentencing phase of trial.[22]

---

[16] *Berghuis v. Smith*, 559 U.S. 314, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010).

[17] *Holland v. Illinois*, 493 U.S. 474, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990).

[18] *Lockhart v. McCree, supra* note 1.

[19] *Holland v. Illinois, supra* note 17, 493 U.S. at 483.

[20] *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).

[21] *Lockhart v. McCree, supra* note 1, 476 U.S. at 179.

[22] See *Lockhart v. McCree, supra* note 1.

The Court has explained there must be a balance between the interests of the defendant and of the State in a capital case. While a criminal defendant has the right to an impartial jury drawn from a venire that has not been "tilted"[23] in favor of capital punishment by selective prosecutorial challenges for cause, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. To balance these interests, a juror who is substantially impaired in the ability to impose the death penalty can be excused by the State for cause while a juror who is not thereby substantially impaired cannot be excused for cause.[24] Similarly, a juror who is substantially impaired in the ability to choose life imprisonment can be excused by the defendant for cause, while a juror who is in favor of the death penalty but who is not thereby substantially impaired cannot be excused for cause.[25]

[10] In order to meaningfully effectuate these constitutional protections, there must be an adequate voir dire.[26] The U.S. Supreme Court has held that in a capital case where the jury is directly involved in sentencing, this entails the opportunity to inquire into whether views on the death penalty would disqualify prospective jurors from sitting.[27] General questions as to prospective jurors' ability to remain fair and impartial and to follow the law are inadequate substitutes for more specific questions, when requested, as to whether the jurors are "unalterably in favor of, or opposed to, the death penalty in every case."[28]

---

[23] *Uttecht v. Brown*, 551 U.S. 1, 9, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007).

[24] *Id*.

[25] See, *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).

[26] See *id*. See, also, *Lockhart v. McCree, supra* note 1.

[27] See *Morgan v. Illinois, supra* note 25.

[28] *Id.*, 504 U.S. at 735.

In *Lockhart v. McCree*,[29] the Supreme Court held that even though death qualification is more directly pertinent to the penalty phase, it did not violate the Sixth Amendment to death qualify a jury before the guilt phase of a capital trial. The Court said in *Witherspoon v. Illinois*[30] that the State "crossed the line of neutrality" by systematically excluding for cause members of the venire who had general scruples against capital punishment but who could nevertheless obey their oaths[31] and said that culling all jurors "who harbor doubts about the wisdom of capital punishment," but who were nevertheless capable of obeying their oath, produces a jury that does not "speak for the community" and is "uncommonly willing to condemn a man to die."[32] The Court in *McCree* pointed out its statements in *Witherspoon* were in the context of a system where the jury had considerable discretion at sentencing. Regardless, *McCree* explained a narrower elimination for cause of jurors who are unable to apply the law to the facts because of their beliefs on capital punishment does not similarly cross the line of neutrality.[33]

[11,12] Even assuming for purposes of its opinion that death-qualified juries are "somewhat more 'conviction-prone,'"[34] the Court in *McCree* explained that "groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section

---

[29] *Lockhart v. McCree, supra* note 1.

[30] *Witherspoon v. Illinois, supra* note 20.

[31] *Id.*, 391 U.S. at 520. See *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980). See, also, *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987); *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

[32] *Id.*, 391 U.S. at 520, 521. See, also, *Adams v. Texas, supra* note 31; *Gray v. Mississippi, supra* note 31; *Wainwright v. Witt, supra* note 31.

[33] *Lockhart v. McCree, supra* note 1.

[34] *Id.*, 476 U.S. at 173.

purposes."[35] In order to establish a prima facie violation of the fair-cross-section requirement under the Sixth Amendment, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.[36]

[13,14] The Court reiterated an impartial jury is "nothing more than jurors who will conscientiously apply the law and find the facts."[37] "[I]t is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints."[38] Also, the Court noted the same allegedly conviction-prone individuals could end up on the defendant's jury through "'luck of the draw.'" It did not "understand the logic of the argument that a given jury is unconstitutionally partial when it results from a state-ordained process, yet impartial when exactly the same jury results from mere chance."[39] Beliefs with respect to the death penalty, said the Court, are within the individual's control. Death qualification does not create an appearance of unfairness, as it only results in the removal for cause of those jurors who are unwilling "to temporarily set aside their own beliefs in deference to the rule of law."[40]

Death qualification before the guilt phase, said the Court, serves a legitimate state interest in obtaining a single jury

---

[35] *Id.*, 476 U.S. at 174.

[36] *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

[37] *Lockhart v. McCree, supra* note 1, 476 U.S. at 178 (internal quotation marks omitted).

[38] *Id.*, 476 U.S. at 183.

[39] *Id.*, 476 U.S. at 178.

[40] *Id.*

that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial.[41] Given that much of the same evidence would be presented at both phases of the capital trial, it served the interests both of the prosecution and of the defense to avoid the burden of having to present the evidence and testimony twice.[42] This is balanced against the fact that there is less concern during the conviction stage of the effect of an imbalanced jury. The Court explained, "[J]ury discretion is more channeled" in its more traditional role of finding the facts and determining the guilt or innocence of a criminal defendant.[43]

In *Buchanan v. Kentucky*,[44] the Court extended its rationale from *McCree* to hold that the constitutional rights of a noncapital defendant were not violated by death qualification of the jury before the guilt phase of a joint trial with a capital codefendant. The Court said the state has a significant interest in having a joint trial of defendants when the crimes charged arise out of one chain of events. The joint trial may benefit the noncapital defendant as well.[45] In joint trials, the "jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials" and "may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing."[46] Furthermore, the State has a genuine interest in avoiding the burden of presenting the same evidence to different

---

[41] See *Lockhart v. McCree, supra* note 1.

[42] See *id.*

[43] *Id.*, 476 U.S. at 183.

[44] *Buchanan v. Kentucky*, 483 U.S. 402, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987).

[45] See *id.*

[46] *Id.*, 483 U.S. at 418.

juries for different defendants charged with crimes arising from the same events.[47]

The Court said in *Buchanan* that these interests in a joint trial, combined with the interest discussed in *McCree* in having the same jury for the guilt and penalty phases of a capital defendant's trial, "argue[] strongly in favor of permitting 'death qualification' of the jury."[48] It also reiterated that any concern about the possible effect of an allegedly imbalanced jury was not present because of the limited nature of the jury's discretion in the trial, which was generally more "channeled than at a capital-sentencing proceeding."[49] At sentencing, under the statutory scheme at issue in *Buchanan*, the jury's sentence was limited to specific statutory sentences and subject to review by the judge. In light of the presupposition in *Buchanan* that jury members selected from a fair cross-section of the community are impartial so long as they can properly carry out their duties, as well as the State's significant interests in the joint trial, the Court held there was no violation of the noncapital defendant's 6th and 14th Amendments right to an impartial jury.

Trail correctly points out that a panel of judges, rather than the jury, decides the defendant's punishment in capital cases in Nebraska.[50] This has long been true. Accordingly, we have acknowledged the death-qualification case law of the U.S. Supreme Court is factually distinguishable; the juries in those cases ultimately determined the sentence.[51] Nonetheless, we have not been persuaded that this factual distinction is determinative of Sixth Amendment challenges in capital cases in Nebraska where juries have decided if any of the alleged

---

[47] *Id.*

[48] *Id.*, 483 U.S. at 419-20.

[49] *Id.*, 483 U.S. at 420.

[50] See 1973 Neb. Laws, L.B. 268.

[51] See, *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986).

aggravating circumstances were proved beyond a reasonable doubt.[52] In this context, we have specifically rejected the argument that it is unconstitutional to death qualify juries in capital cases in Nebraska because those juries do not ultimately decide if the sentence shall be life or death.[53] Instead, we have repeatedly held under the Sixth Amendment that it is permissible to determine during voir dire whether jurors' views on capital punishment would prevent or substantially impair their ability to impartially apply the law to the evidence—and to exclude them for that reason.[54]

Our case law on death qualification has not explicitly addressed the argument raised by Trail in this appeal that the State lacks a legitimate interest in death qualifying the venire because it can ensure jurors' beliefs will not interfere with their duties by never telling them they are sitting in a capital case. This novel argument does not cause us to question our prior holdings.

We cannot, as Trail implicitly suggests, presume potential jurors come to the jury pool ignorant of the law. To the contrary, jurors, as citizens of this state, are presumably aware the law provides for the death penalty as a possible punishment for murder under certain circumstances. And the circumstances making the death penalty a legal possibility are likely to become apparent during the course of the State's presentation of the evidence at trial. While the jurors will not know with certainty whether the State has in fact alleged an aggravator in any given case, they will not have the level of ignorance Trail believes possible.

---

[52] See *id.* See, also, *State v. Nesbitt*, 264 Neb. 612, 650 N.W.2d 766 (2002); *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990); *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); *State v. El-Tabech*, 225 Neb. 395, 405 N.W.2d 585 (1987); *State v. Peery*, 223 Neb. 556, 391 N.W.2d 566 (1986); *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986); *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984); *State v. Williams, supra* note 6.

[53] *Id*.

[54] See *id.*

[15] Even if the jurors could be sufficiently ignorant of the capital implications of a conviction at the guilt phase of trial, once they are asked to determine if the State has proved an aggravating circumstance beyond a reasonable doubt, any juror knowledgeable of the law will understand it is a capital case. And just as the U.S. Supreme Court has described the State's interest in having the same jury for the guilt and sentencing phases and jointly trying a capital defendant and a noncapital defendant in charges arising out of the same events, the State has an interest in having the same jury determine both the defendant's guilt or innocence and the alleged aggravating circumstances that, if found, will permit a three-judge panel to impose the death penalty. The State has a legitimate interest in avoiding the burden of presenting the same evidence to different juries for the guilt phase and the aggravation phase of trial. Thus, the State has an interest in determining at voir dire whether any jurors will be unable to perform their duties at the aggravation phase of the trial. In other words, the State has a legitimate interest in death qualifying juries in capital cases in Nebraska.

There is a presupposition that a jury selected from a fair cross-section of the community is impartial despite a mix of viewpoints. Groups defined by belief systems that substantially impair persons from performing their duties as jurors are not distinctive groups for fair-cross-section purposes. Even if we assume the result of death qualification is a slightly more conviction-prone jury, the State has a legitimate interest in eliminating from the venire those jurors who cannot carry out their duties because of their views. When the death penalty cannot be imposed before the jury decides if an aggravating circumstance exists, then the State has a reason to question whether views on the death penalty will interfere with that task, and to question the venire accordingly. Moreover, jurors' discretion is much more channeled during the guilt and aggravation stages of trial than at the ultimate sentencing hearing by the three-judge panel.

[16] We hold that the State does not violate the Sixth Amendment right to an impartial jury by death qualifying the jury before a trial wherein it has alleged an aggravator that, if found by the jury, will make the defendant eligible for the death penalty. Although Trail ultimately waived his right to a jury determination of the alleged aggravator, he did so only after the verdict and after the district court rejected his challenges to death qualification.

(b) Equal Protection

[17] We also disagree with Trail's argument that death qualification in Nebraska violates equal protection. The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges.[55] The Equal Protection Clause of the 14th Amendment, § 1, mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike.[56] When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.[57] In equal protection challenges, the burden is on a defendant to "'prove the existence of purposeful discrimination.'"[58]

Trail asserts death qualification creates a classification between capital defendants and noncapital defendants when it subjects capital defendants to allegedly conviction-prone

---

[55] *Citizens for Eq. Ed. v. Lyons-Decatur Sch. Dist.*, 274 Neb. 278, 739 N.W.2d 742 (2007).

[56] *Sherman T. v. Karyn N.*, 286 Neb. 468, 837 N.W.2d 746 (2013).

[57] *Citizens for Eq. Ed. v. Lyons-Decatur Sch. Dist., supra* note 55.

[58] *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

juries that noncapital defendants do not have. He asserts that because jurors can be kept in ignorance of the capital implications of their factfinding, such classification does not rationally further a legitimate state interest. Trail has not proved purposeful discrimination.

We have already rejected Trail's argument that the jury can effectively be suspended in ignorance of the possibility of the death penalty. And we note that in *McCree*, the U.S. Supreme Court implicitly disagreed with the idea that the death qualification of a jury is subject to heightened scrutiny.[59] The Court explicitly distinguished the exclusion of jurors who have decided that their personal views would not allow them to impose the death penalty from prior cases finding unconstitutional the wholesale exclusion of individuals of a particular skin color, ethnic heritage, or gender.

As discussed, the State is entitled to a jury that is capable of performing its duties. Excluding prospective jurors based on voluntary belief systems that render them unable to perform their duties does not create an appearance of unfairness. For purposes of inquiry into views on capital punishment, capital cases and noncapital cases are different. Views on capital punishment are relevant to the ability of jurors to obey their oaths in capital cases. We find no merit to Trail's argument that death qualification of the jury violated his rights to equal protection.

### (c) Heightened Reliability Under Eighth Amendment to U.S. Constitution and Article I, §§ 9 and 15, of Nebraska Constitution

Trail makes one conclusory statement that death qualification violates the heightened reliability required by the Eighth Amendment to the U.S. Constitution and article I, §§ 9 and 15, of the Nebraska Constitution. Conclusory assertions unsupported by coherent analytical argument fail to satisfy the

---

[59] See *Lockhart v. McCree, supra* note 1.

requirement of arguing an assigned error to obtain consideration by an appellate court.[60]

[18] In the absence of analytical support, we hold the Eighth Amendment and article I, §§ 9 and 15, of the Nebraska Constitution are not violated by death qualification in a capital case. We note the U.S. Supreme Court's opinion in *Witherspoon,* which, as discussed, set constitutional limits on excusing jurors for cause because of their beliefs on capital punishment, was based in the Sixth Amendment and nowhere implied the Eighth Amendment is implicated.[61] The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The 14th Amendment applies those restrictions to the States.[62] Under article I, § 9, of the Nebraska Constitution:

> All persons shall be bailable by sufficient sureties, except for treason, sexual offenses involving penetration by force or against the will of the victim, and murder, where the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.

Article I, § 15, states all penalties shall be proportioned to the nature of the offense. Under the Eighth Amendment, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."[63] None of these provisions are violated by the process of death qualifying the jury so that the members of the venire are capable of performing their duties despite their personal views on capital punishment.

---

[60] See *State v. Chase*, 310 Neb. 160, 964 N.W.2d 254 (2021).

[61] See *Witherspoon v. Illinois, supra* note 20.

[62] *Hall v. Florida*, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014).

[63] *Calwell v. Mississippi*, 472 U.S. 320, 329, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) (internal quotation marks omitted).

### (d) § 29-2006(3) Applicable Only
### to Capital Indictments

In the course of arguing the district court erred in death qualifying the jury, Trail asserts that § 29-2006(3) is inapplicable because, on the information alone, he was not eligible for the death penalty. Section 29-2006(3) states:

> The following shall be good causes for challenge to any person called as a juror or alternate juror, on the trial of any indictment: . . . (3) in indictments for an offense the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death . . . .

According to Trail, this is not a trial, described by § 29-2006(3), "in indictments for an offense the punishment whereof is capital" because the death penalty was only a sentencing option upon the State's noticing and proving, after the merits phase, additional facts at an aggravation hearing.

But Trail does not appeal the district court's excusal of any potential juror for cause under § 29-2006(3), and the State's interest in and constitutionality of death qualification does not depend upon a statutory provision. Therefore, we need not address Trail's unique view that he was not charged with "an offense the punishment whereof is capital" for purposes of § 29-2006(3) because the matters making him death eligible were determined after the merits phase of the trial. Regardless of whether that was the case, Trail was given timely notice in the information that the State was planning on proving an aggravating circumstance and the district court did not err in death qualifying the jury for Trail's trial.

### 2. Motion to Sever Murder
### and Conspiracy Charges

Having found no merit to Trail's challenges to death qualification of the jury, we turn to his assignment that the court erred by refusing to sever the trials on the charges for first degree murder and conspiracy to commit first degree murder.

[19,20] There is no constitutional right to a separate trial.[64] Instead, the joinder or separation of charges for trial is governed by § 29-2002, which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

In summary, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant.[65] There is a strong presumption against severing properly joined counts.[66]

[21-23] Trail does not contest that the offenses were sufficiently related to be joinable, but, rather, he asserts the joinder was prejudicial. A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[67] A defendant appealing the denial of a motion to sever has the burden to show compelling, specific, and actual prejudice.[68] Severe prejudice occurs

---

[64] *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

[65] *Id.*

[66] *Id.*

[67] *State v. Henry, supra* note 7.

[68] *State v. Benson, supra* note 64.

when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.[69] Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge.[70]

Trail argues he was prejudiced by the joinder because "it is likely that all the evidence that might have been admissible in a trial of either [the murder count or the conspiracy count] tried separately would not have been admissible if Count I, Murder in the First Degree were tried separately."[71] Trail does not point out which specific statements were entered into evidence by virtue of the joinder, which would have been inadmissible otherwise. Rather, he generally asserts the State was allowed to introduce hearsay evidence to establish a conspiracy, lifting the conspiracy "'by its own bootstraps,'"[72] then utilizing that conspiracy evidence to get a conviction on the murder charge.

Such arguments fall far short of showing compelling, specific, and actual prejudice. Most fundamentally, however, there is no merit to Trail's assumption that different hearsay rules apply to proof of a conspiracy in a trial on a conspiracy charge versus proof of a conspiracy in a trial on a murder charge.

[24-26] In *State v. Hudson*,[73] we specifically held that the coconspirator exception to the hearsay rule is applicable regardless of whether a conspiracy has been charged in the information. Under Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2016), a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Under the coconspirator exception to the hearsay rule, the declarant conspirator who partners with others in the commission of a crime is considered the agent of

---

[69] *Id.*

[70] *Id.*

[71] Brief for appellant at 23.

[72] *Id.*

[73] *State v. Hudson*, 279 Neb. 6, 775 N.W.2d 429 (2009).

his or her fellow conspirators, and the commonality of interests gives some assurance that the statements are reliable.[74] Whether or not a conspiracy has been charged in the information, before the trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence, to prevent the danger of hearsay evidence being lifted by its own bootstraps.[75]

Our review of the record demonstrates the district court was aware of Trail's concerns and insisted the State establish by independent evidence a prima facie case of the conspiracy before it admitted Boswell's out-of-court statements. We find no merit to this assignment of error.

### 3. Sequestration

Trail next argues the district court erred in allowing Sydney's mother to remain in the courtroom "in violation of its own sequestration order."[76] Trail elaborates that under Neb. Rev. Stat. § 27-615 (Reissue 2016), he had a right to have the witnesses excluded so that they could not hear the testimony of other witnesses. Trail does not explain how he was prejudiced by the district court's ruling other than generally noting Sydney's mother "remained in the front of the courtroom for the majority of the balance of the trial within sight of the jury and was able to hear the testimony of all the other witnesses."[77]

[27,28] Section 27-615 provides, with certain exceptions not here applicable that "[a]t the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . . ." However, we have long held that the exclusion or sequestration of a witness is

---

[74] *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

[75] See *State v. Estrada Comacho*, 309 Neb. 494, 960 N.W.2d 739 (2021).

[76] Brief for appellant at 25.

[77] *Id.* at 26.

within the discretion of the trial court.[78] It is for the trial court to determine the extent to which a sequestration order will be applied in a given case.[79] Sequestration is based on the belief that not hearing other witnesses' testimony tends to better elicit the truth and promote the ends of justice, but this reasoning generally applies only to unexamined witnesses.[80] Thus, generally speaking, a request for sequestration of witnesses is a request that they be excluded from the courtroom until called to testify.[81] The denial of a sequestration motion will not be overturned absent evidence of prejudice to the defendant.[82]

The district court did not abuse its discretion in allowing Sydney's mother to remain in the courtroom after she testified and after the court released her from sequestration. Furthermore, Trail has failed to demonstrate he was prejudiced by her presence. While the defense was given the opportunity to recall Sydney's mother in order to reopen cross-examination, it did not elect to do so. The fact that the mother of a murder victim was present in the courtroom in view of the jury during trial does not in itself demonstrate prejudice to the defendant.

## 4. Courtroom Disruption

Trail argues that his outburst at trial—"curse you all" and cutting his neck with a razor blade—was of such a nature that its damaging effect could not be removed by admonition or instruction and that the court should have granted his motion for a mistrial. Even if an admonition or instruction could have otherwise removed the prejudice, according to Trail, the court's procedure of first ordering the jurors to disregard

---

[78] *State ex rel. NSBA v. Miller*, 258 Neb. 181, 602 N.W.2d 486 (1999).

[79] *State v. Swillie, supra* note 8.

[80] See *State ex rel. NSBA v. Miller, supra* note 78.

[81] *State v. Hess*, 225 Neb. 91, 402 N.W.2d 866 (1987).

[82] *State ex rel. NSBA v. Miller, supra* note 78.

the outburst and then asking them if they could follow the court's instruction was insufficient because it put the jurors in a difficult position of stating they could not follow the court's order. Similarly, Trail argues his motion for a new trial should have been granted because of his disruption. Trail suggests the additional evidence submitted in support of the motion for new trial, entered under seal, showed the self-harm was due to "misconduct of agents of the prosecuting attorney,"[83] because it would not have occurred had jail staff implemented extra security measures warranted by specific knowledge. We hold the district court did not err in denying Trail's motions for a mistrial and for a new trial.

[29-31] A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[84] A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial.[85] The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[86] Absent evidence to the contrary, the legal system presumes that jurors, to the extent they are able, will comply with curative instructions and judicial admonitions.[87]

[32,33] A motion for a new trial is a statutory remedy and can be granted by a court of law only upon the grounds, or

---

[83] Brief for appellant at 36.

[84] *State v. Figures, supra* note 9.

[85] *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

[86] *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[87] See, David F. Herr & Roger S. Haydock, Motion Practice § 21.04 (8th ed. 2021) (discussing curative instructions); David Paul Nicoli, *Federal Rules of Criminal Procedure 23(b) and 24(c): A Proposal to Reduce Mistrials Due to Incapacitated Jurors*, 31 Am. U.L. Rev. 651 (1982). See, also, *U.S. v. Dunlap*, 28 F.3d 823 (8th Cir. 1994).

some of them, provided for by the statutes.[88] The grounds on which a trial court may order a new trial after a criminal conviction has been entered are specified in Neb. Rev. Stat. § 29-2101 (Reissue 2016). The asserted ground for a new trial must affect adversely the substantial rights of the defendant, and it must be shown that the defendant was prejudiced thereby.[89]

[34-36] A trial court is vested with considerable discretion in passing on motions for mistrial and new trial,[90] and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.[91] It is an abuse of discretion to make an error of law or clear errors of factual determination.[92] Our deference to the trial court stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial.[93] The trial judge has a special perspective on the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record.[94] The trial court is likewise in a better position to make credibility determinations of jurors' statements concerning whether they were influenced by extraneous information.[95]

---

[88] See *Greenberg v. Fireman's Fund Ins. Co.*, 150 Neb. 695, 35 N.W.2d 772 (1949). See, also, *State v. Bartel*, 308 Neb. 169, 953 N.W.2d 224 (2021).

[89] *State v. Tainter*, 218 Neb. 855, 359 N.W.2d 795 (1984).

[90] See *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). See, also, *State v. Madren*, 308 Neb. 443, 954 N.W.2d 881 (2021); *State v. Grant, supra* note 85.

[91] See, *State v. Figures, supra* note 9; *State v. Bartel, supra* note 88.

[92] See, *U.S. v. McDaniel*, 398 F.3d 540 (6th Cir. 2005); *U.S. v. Petrie*, 302 F.3d 1280 (11th Cir. 2002).

[93] *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

[94] See *id*.

[95] See *Scherz v. Platte Valley Public Power and Irrigation District*, 151 Neb. 415, 37 N.W.2d 721 (1949). See, also, *State v. Jenkins, supra* note 11.

[37] The district court, after considering all the evidence submitted by the parties at the hearing on the motion for new trial, found Trail's act of self-harm was "a calculating gesture," and we will not disturb this finding on appeal. As a general matter, a defendant is not permitted to profit from the defendant's own bad conduct by disrupting courtroom proceedings and then urging disruption as a ground for mistrial.[96] "To hold otherwise would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so, either inside or outside the courtroom."[97] As the U.S. Supreme Court has explained in the context of the right to be present at trial, an accused cannot be permitted through disruptive conduct to indefinitely avoid being tried.[98] "It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes."[99]

In accordance with these principles, in *State v. Grant*,[100] we held the trial court did not err in denying the defendant's

---

[96] See, *United States v. Bentvena*, 319 F.2d 916 (2d Cir. 1963); *Hayes v. State*, 340 So. 2d 1142 (Ala. Crim. App. 1976); *People v. Dunn*, 141 Cal. Rptr. 3d 193, 205 Cal. App. 4th 1086 (2012); *Hammond v. United States*, 345 A.2d 140 (D.C. 1975); *State v. Ganal*, 81 Haw. 358, 917 P.2d 370 (1996); *State v. Doyle*, 335 So. 3d 393 (La. App. 2021); *State v. Eaton*, 563 S.W.3d 841 (Mo. App. 2018); *State v. Grant, supra* note 85; *People v. Mabre*, 166 A.D.2d 339, 561 N.Y.S.2d 10 (1990); *State v. Joiner*, 237 N.C. App. 513, 767 S.E.2d 557 (2014); *State v. Linkous*, 177 W. Va. 621, 355 S.E.2d 410 (1987). See, also, generally, Annot., 89 A.L.R.3d 960 (1979 & Supp. 2022). But see, e.g., *People v. Blunt*, 273 A.D.2d 146, 709 N.Y.S.2d 560 (2000) (defendant's orations containing inadmissible and highly prejudicial factual assertions were too extensive and damaging to be dealt with through curative instructions and jury inquiries).

[97] *Hammond v. United States, supra* note 96, 345 A.2d at 141.

[98] *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).

[99] *Id*., 397 U.S. at 346.

[100] *State v. Grant, supra* note 85.

motion for a mistrial based on his conduct during trial of suddenly standing up and punching his counsel in the head, after which a scuffle with law enforcement ensued to restrain him. The defendant was subsequently found guilty of first degree murder and use of a deadly weapon to commit a felony. The court admonished the jury members and asked them to notify the court if they could no longer be fair and impartial. None did. While it appeared the altercation upset at least one member of the jury, we pointed out the reactions at issue would not have occurred without the defendant's own outburst.[101] We would not "permit a defendant to benefit from his or her own bad behavior during trial."[102] We also found that because the jury members were admonished and indicated they could remain fair and impartial, the defendant had failed to demonstrate prejudice. We reached a similar conclusion for similar reasons in *State v. Blackwell*,[103] affirming the court's denial of a motion for new trial based on the defendant's yelling at witnesses during their testimony.

When the trial court has endeavored to promptly ameliorate any prejudicial effect, even frequent offensive and violent outbursts by defendants will not ordinarily require a mistrial or a new trial.[104] In *United States v. Bentvena*,[105] a series of "dramatic disturbances" by several defendants did not warrant a mistrial when the prosecution had done nothing to provoke the incidents and the judge did all in his power to minimize their effect. To hold otherwise, explained the court, "would produce little less than anarchy."[106]

[38] Neither are disruptive acts of the defendant irremediable simply because they reflect some attribute consistent

---

[101] See *id.*

[102] *Id.* at 194, 876 N.W.2d at 664.

[103] *State v. Blackwell*, 184 Neb. 121, 165 N.W.2d 730 (1969).

[104] See, e.g., *United States v. Bentvena, supra* note 96.

[105] *Id.* at 930.

[106] *Id.* at 931.

with the charged crime. For example, in *People v. White*,[107] a defendant on trial for escape was not entitled to a mistrial after the jury saw him flee the courtroom when the State's last witness took the stand. The court found the defendant's "'contumacious'" behavior should not entitle him to a mistrial absent "irremedial prejudice."[108] And it found that the trial court's actions in promptly escorting the jury members from the courtroom and admonishing them to keep an open mind adequately minimized the likelihood of prejudice.[109]

As with these other defendants, we will not permit Trail to benefit from his own bad behavior during trial. The court described that, after yelling, "[Boswell] is innocent, and I curse you all," Trail made some slashing gestures at his neck and some blood was visible. While dramatic, the incident was not of such a nature to create irremediable prejudice.

We find no merit to Trail's assertion that the violent disruption was irremediably prejudicial because he could not thereafter argue to the jury he was incapable of violence and, thus, innocent. The same could be said of any violent outburst during the trial on charges of any violent crime. Moreover, it is apparent it was never defense counsel's strategy to argue Trail was nonviolent, arguing instead that Trail had unintentionally killed Sydney while engaged in sadomasochistic consensual asphyxiation. Similarly, Trail's statement about cursing "you all" was not irremediably prejudicial because Sydney's murder was allegedly connected to witchcraft. And even assuming Trail's outburst was construed by jurors as a call to the supernatural rather than a more mundane expression of outrage, such beliefs were cumulative of Trail's own testimony that he believed in spiritual witches.

The trial court endeavored to promptly ameliorate any prejudicial effect by clearing the jury from the courtroom and

---

[107] *People v. White*, 199 A.D.2d 558, 606 N.Y.S.2d 49 (1993).

[108] *Id.* at 559, 606 N.Y.S.2d at 50.

[109] See *id.*

instructing it "to disregard the outburst that you heard this morning and to not consider it in your deliberations at the end of the trial." After interviewing each of the jurors individually, the district court found they were able to follow the curative instruction to disregard the outburst and remain fair and impartial in their deliberations. We disagree with Trail's assertion that the court's procedure of giving the curative instruction before individually interviewing the jurors pressured the jurors into falsely proclaiming they could follow the court's instruction. We will not second-guess the court's evaluation of the credibility of the jurors' assurances that they could remain fair and impartial. The disruption was not so damaging that a reasonable juror would be incapable of following curative instructions or of knowing his or her own capacity to remain impartial. The court did not err in finding that Trail did not suffer actual prejudice.

Trail's arguments pertaining to jail staff's negligence are irrelevant to our analysis, and we therefore do not determine the extent of such negligence, if any. Whatever security measures jail staff could have taken to prevent Trail from secreting the razor blade into the courtroom, Trail's responsibility for intentionally disrupting the trial would remain the same. Whether or not jail staff should have done more to prevent it, Trail should not benefit from this "calculating gesture."

The district court did not abuse its discretion in denying Trail's motions for a mistrial and a new trial. We turn to Trail's assignments of error relating to sentencing.

### 5. Constitutionality of Findings of Whether Aggravating Circumstances Justify Death Penalty and Relative Weight of Aggravating and Mitigating Circumstances Being Made by Judges Rather Than Jury

Trail assigns the district court erred in sentencing him to death because Nebraska's death penalty scheme is unconstitutional. He argues that because a panel of judges rather than

a jury makes findings of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the aggravating circumstances, Nebraska's death penalty scheme violates article I, §§ 6 and 9, of the Nebraska Constitution and the 6th and 8th Amendments to the U.S. Constitution, made applicable to the states through the 14th Amendment. We disagree.

Under Nebraska's capital sentencing scheme, a jury, if not waived,[110] only determines the existence of aggravating circumstances.[111] A jury's participation in the death penalty sentencing phase, if not waived,[112] ceases after the determination of aggravating circumstances.[113] A three-judge panel determines the existence of mitigating circumstances, weighs aggravating and mitigating circumstances, and determines the sentence.[114] Section 29-2522 provides the guidelines for the three-judge panel's sentencing determination:

> The panel of judges for the sentencing determination proceeding shall either unanimously fix the sentence at death or, if the sentence of death was not unanimously agreed upon by the panel, fix the sentence at life imprisonment. Such sentence determination shall be based upon the following considerations:
>
> (1) Whether the aggravating circumstances as determined to exist justify imposition of a sentence of death;
>
> (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or

---

[110] See Neb. Rev. Stat. § 29-2520(3) (Cum. Supp. 2020).

[111] See § 29-2520(4)(g).

[112] See § 29-2520(3).

[113] See § 29-2520(4)(g).

[114] § 29-2521.

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In each case, the determination of the panel of judges shall be in writing and refer to the aggravating and mitigating circumstances weighed in the determination of the panel.

### (a) Sixth Amendment

[39] The Sixth Amendment right to a speedy and public trial by an impartial jury, in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt.[115] Article I, § 6, of the Nebraska Constitution provides: "The right of trial by jury shall remain inviolate . . . ."

In *Apprendi v. New Jersey*[116] and *Ring v. Arizona*,[117] the U.S. Supreme Court held that under the Sixth Amendment, a defendant has a right to have any "fact on which the legislature conditions an increase in their maximum punishment" determined by a jury, even if the State characterizes that factual finding as a sentencing factor rather than an element.[118] "[T]he relevant inquiry is one not of form, but of effect."[119]

[40] The Court in *Ring* elaborated that under a statutory scheme in which the death penalty cannot be imposed unless at least one aggravating factor is found to exist beyond a reasonable doubt, the Sixth Amendment requires the factual determination of the aggravating factor be entrusted to the jury. "[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a

---

[115] *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016).

[116] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[117] *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[118] *Id.*, 536 U.S. at 589.

[119] *Apprendi v. New Jersey, supra* note 116, 530 U.S. at 494.

finding of some aggravating fact[,] . . . the core crime and the aggravating fact together constitute an aggravated crime."[120] The Court found that "enumerated aggravating factors [of state laws] operate as the functional equivalent of an element of a greater offense."[121]

The Court in *Ring* expressly observed, however, it was not addressing whether the Sixth Amendment forbade determinations by judges, rather than juries, of mitigating circumstances, the relative weight of aggravating and mitigating circumstances, or the ultimate sentencing decision. In fact, the Court in *Ring* reiterated the distinction between facts of mitigation versus aggravation, as well as its prior pronouncement in *Proffitt v. Florida*[122] that "'[i]t has never [been] suggested that jury sentencing is constitutionally required.'"[123]

In several cases, we have rejected the argument that because the right to a jury determination is limited to guilt or innocence of the crimes charged and the determination of the aggravating circumstances, Nebraska's sentencing scheme is unconstitutional under the 6th and 14th Amendments to the U.S. Constitution and article I, §§ 3 and 6, of the Nebraska Constitution.[124] In *State v. Gales (Gales I)*,[125] we explained that *Apprendi* and *Ring* do not stand for the proposition that a jury, rather than a judge or judges, must make the sentencing determinations listed under § 29-2522. Rather, *Apprendi* and *Ring* affected only the narrow issue of whether there is

[120] *Ring v. Arizona, supra* note 117, 536 U.S. at 605 (internal quotation marks omitted).

[121] *Id.*, 536 U.S. at 609 (internal quotation marks omitted).

[122] See *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976).

[123] *Ring v. Arizona, supra* note 117, 536 U.S. at 597-98 n.4.

[124] See, *State v. Jenkins, supra* note 11; *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018); *State v. Hessler*, 274 Neb. 478, 741 N.W.2d 406 (2007); *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

[125] *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003).

a Sixth Amendment right to have a jury determine the existence of any aggravating circumstance upon which a capital sentence is based.

[41] We noted in *Gales I* that the U.S. Supreme Court, in *Tuilaepa v. California*,[126] had described statutory schemes similar to the one in Nebraska as being composed of an "'eligibility decision,'" in which there must be a determination of the existence of one or more prescribed aggravating circumstances before a defendant is eligible for a sentence of death and a "'selection decision,'" in which the sentence determines whether a defendant who is thereby death eligible should in fact receive the death penalty, based upon an individualized determination of the character of the individual and the circumstances of the crime.[127] The "eligibility decision" stemmed from a series of U.S. Supreme Court decisions holding that in order to render a defendant eligible for the death penalty, the trier of fact must convict the defendant of murder and also find one "'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."[128] We pointed out that the U.S. Supreme Court, in both *Proffitt*[129] and *Spaziano v. Florida*,[130] had rejected arguments that the selection decision, as opposed to the eligibility decision, must be made by a jury, and the Court in *Ring* appeared to continue

---

[126] *Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[127] *Gales I, supra* note 125, 265 Neb. at 609, 658 N.W.2d at 614, quoting *Tuilaepa v. California, supra* note 126.

[128] *Tuilaepa v. California, supra* note 126, 512 U.S. at 971-72. See, *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988); *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977). See, also, *Jones v. United States*, 527 U.S. 373, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999).

[129] See *Proffitt v. Florida, supra* note 122.

[130] *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), *overruled, Hurst v. Florida, supra* note 115.

to approve of the distinction between eligibility and selection decisions for purposes of the Sixth Amendment.[131] We accordingly held that the Sixth Amendment requires only the right to a jury determination of the death-eligibility finding of one or more aggravating circumstances and it does not apply to the selection decision.

Relying on the 2016 U.S. Supreme Court decision in *Hurst v. Florida*,[132] Trail asserts that *Gales I* and its progeny are no longer good law. We disagree.

In *Hurst*, the Court held that a "hybrid"[133] sentencing scheme, in which the jury made a merely "advisory"[134] recommendation of life or death and did not make a binding finding as to the existence of any aggravating circumstance, violated the Sixth Amendment. The sentencing scheme required the jury to render an advisory verdict of life or death while the sentencing judge then exercised independent judgment to determine the existence of aggravating and mitigating factors and made an independent judgment, after weighing the aggravating and mitigating factors, about whether the sentence should be life or death. The sentencing statute specified that a defendant was not death eligible until the court (not a jury) made independent findings that the person shall be punished by death—which included finding that sufficient aggravating circumstances existed and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances.[135]

The Supreme Court in *Hurst* rejected the State's argument that the scheme was constitutional because a jury implicitly found at least one aggravating circumstance when it recommended the death penalty. The Court explained, "The State

---

[131] *Gales I, supra* note 125.

[132] *Hurst v.* Florida*, supra* note 115.

[133] *Id.*, 577 U.S. at 95 (internal quotation marks omitted).

[134] *Id.* (internal quotation marks omitted).

[135] See *id.*

fails to appreciate the central and singular role the judge plays"[136] under the law wherein "[t]he trial court *alone* must"[137] make the "critical findings necessary to impose the death penalty"[138] without which the defendant's maximum authorized punishment would be life imprisonment.

We recently addressed *Hurst* in *State v. Jenkins*.[139] We held on direct appeal from the defendant's conviction and sentence to the death penalty that *Hurst* did not require us to reexamine our prior conclusion that the Sixth Amendment does not require the jury to determine mitigating circumstance, perform the balancing function, or conduct the proportionality review.

Similarly, in *State v. Lotter*,[140] we held, for purposes of the statute of limitations for a postconviction action, that *Hurst* did not announce a new rule of law. We explained *Hurst* was merely an application of *Ring* to the sentencing scheme under which the judge alone found the existence of any aggravating circumstance that made the defendant death eligible.

We explained in *Lotter* that isolated references in *Hurst* to the sentencing scheme's requirement that the court find there were insufficient mitigating circumstances to outweigh the aggravating circumstances did not mean that the Supreme Court had held the jury rather than a judge must find that the aggravating circumstances outweigh the mitigating ones. Rather, we sided with the opinion of most federal and state courts, which agree *Hurst* does not stand for the proposition that a jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances.[141]

---

[136] *Id.*, 577 U.S. at 99.

[137] *Id.*, 577 U.S. at 100.

[138] *Id.*, 577 U.S. at 98.

[139] *State v. Jenkins, supra* note 11.

[140] *State v. Lotter, supra* note 124.

[141] *Id.*

[42] After *Jenkins* and *Lotter*, the U.S. Supreme Court, in *McKinney v. Arizona*,[142] implicitly confirmed the validity of our analysis and the majority view. The Court held that on remand for a reweighing of the aggravating and mitigating circumstances (after federal habeas corpus review found the trial court had erred by refusing to consider the mitigating circumstance of the defendant's post-traumatic stress disorder), a judge, rather than a jury, could conduct the reweighing. The Supreme Court specifically rejected the defendant's argument that its holding in *Hurst* required a jury to reweigh aggravating and mitigating circumstances. The Court reiterated, "[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range."[143] The Court explained that *Ring* and *Hurst* stand only for the proposition that a jury must find an aggravating circumstance that makes the defendant death eligible. "In short," said the Court, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances"[144] and "'States that leave the ultimate life-or-death decision to the judge may continue to do so.'"[145]

[43] By leaving to the three-judge panel the ultimate life-or-death decision upon making the selection decisions of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the aggravating circumstances, Nebraska's sentencing scheme does not violate

___

[142] *McKinney v. Arizona*, ___ U.S. ___, 140 S. Ct. 702, 206 L. Ed. 2d 69 (2020).

[143] *Id.*, 140 S. Ct. at 707.

[144] *Id.*, 140 S. Ct. at 708.

[145] *Id.*, 140 S. Ct. at 708, quoting *Ring v. Arizona, supra* note 117 (Scalia, J., concurring; Thomas, J., joins).

the Sixth Amendment right to a jury trial or article I, § 6, of the Nebraska Constitution.

### (b) Eighth Amendment

Taking a more novel tack, Trail asserts Nebraska's delegation of the selection criteria and ultimate life-or-death decision to the three-judge panel violates the Eighth Amendment to the U.S. Constitution and article I, § 9, of the Nebraska Constitution. He asserts that allowing judge-determined death sentences has fallen outside society's evolving standards of decency and that jurors, rather than judges, can more reliably express society's consensus of whether a sentence of death is the adequate response to the defendant's crimes. It does not appear we have ever addressed this specific argument. We conclude it lacks merit.

[44] The Cruel and Unusual Punishment Clause prohibits (1) "barbaric punishments under all circumstances" and (2) punishments that are not "'graduated and proportioned to [the] offense.'"[146] Most cases involve disproportionality.[147] On disproportionality, there is a body of case law applying categorical rules under the Eighth Amendment in light of either the "nature of the offense" or the "characteristics of the offender."[148] In adopting such rules, the U.S. Supreme Court has considered, first, "'objective indicia of society's standards' . . . to determine whether there is a national consensus against the sentencing practice at issue."[149] It then has exercised its own independent judgment, guided by "'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose.'"[150]

---

[146] *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[147] See *id.*

[148] *Id.*, 560 U.S. at 60.

[149] *Id.*, 560 U.S. at 61.

[150] *Id.*

The U.S. Supreme Court has recognized that the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons "'[b]y protecting even those convicted of heinous crimes . . . .'"[151] "To enforce the Constitution's protection of human dignity, this Court looks to the 'evolving standards of decency that mark the progress of a maturing society.'"[152] This is necessary because the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment, and what is considered cruel and unusual punishment must change as the basic mores of society change.[153]

The U.S. Supreme Court has also said, "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case."[154] In order to ensure that reliability, "the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense.'"[155]

None of these Eighth Amendment principles are pertinent to whether a jury, as opposed to a judge, weighs the aggravating against the mitigating circumstances and makes the ultimate determination if death is the appropriate punishment. In fact, the U.S. Supreme Court has recognized as much. In *Clemons v. Mississippi*,[156] in addition to addressing the Sixth

---

[151] *Hall v. Florida,* supra note 62, 572 U.S. at 708, quoting *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

[152] *Id.*, quoting *Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590, 1 L. Ed. 2d. 630 (1958).

[153] *State v. Boche*, 294 Neb. 912, 885 N.W.2d 523 (2016).

[154] *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988) (internal quotation marks omitted).

[155] See *Lockett v. Ohio*, 438 U.S. 586, 601, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).

[156] *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990).

Amendment, the U.S. Supreme Court held it does not violate the Eighth Amendment for an appellate court, rather than remand for a jury reweighing, to uphold a death sentence by itself reweighing on appeal the aggravating and mitigating evidence. One aggravating circumstance found below had been held on appeal to be unconstitutionally vague, but the other aggravating circumstance was held to be valid.[157] The Court explained, "The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime."[158] "[S]tate appellate courts can and do give each defendant an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime."[159] This holding in *Clemons* was reaffirmed after *Hurst*[160] by the Court's opinion in *McKinney*.[161]

In arguing that the Eighth Amendment is relevant to procedures such as whether a panel of judges rather than a jury makes the final selection determinations necessary to impose the death penalty, Trail relies on *Hall v. Florida*.[162] In *Hall*, the U.S. Supreme Court held that a statutory scheme making an intellectual quotient score final and conclusive on whether a defendant was intellectually disabled, without allowing consideration of additional evidence of intellectual disability, violated the Eighth Amendment when the scientific community and the national consensus recognized the specified score to be at the lower end of the inherent margin of error for a range demonstrating intellectual disability. Applying

---

[157] See *id.*

[158] *Id.*, 494 U.S. at 748.

[159] *Id.*, 494 U.S. at 749.

[160] *Hurst v. Florida, supra* note 115.

[161] *McKinney v. Arizona, supra* note 142.

[162] *Hall v. Florida, supra* note 62.

its prior holding in *Atkins v. Virginia*[163] that the 8th and 14th Amendments to the U.S. Constitution forbid the execution of persons with intellectual disability, the Court held the rigid statutory rule respecting intellectual quotient scores "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional."[164]

*Hall* is not apposite to the case at bar. Having a three-judge panel weigh aggravators against mitigators and determine the ultimate sentence does not create an unacceptable risk that persons will be executed without the constitutionally required consideration of character and record of the individual offender and the circumstances of the particular offense.

[45] In *State v. Mata*,[165] we rejected the defendant's argument that a system wherein a three-judge panel weighs the aggravating and mitigating circumstances without guidance from the jury is arbitrary and capricious under the 8th and 14th Amendments. In *State v. Hessler*,[166] we rejected the defendant's argument under the Eighth Amendment that a sentencing panel is not in as good of a position as the jury to assign a weight to the aggravating circumstances, to weigh aggravating circumstances against mitigating circumstances, or to determine the sentence. While Trail's 8th Amendment arguments are somewhat different from those addressed in *Mata* and *Hessler*, he presents no reason to depart from our holdings in those cases that Nebraska's statutory scheme, delegating to the three-judge panel determinations of whether the aggravating circumstances justify the death penalty and whether sufficient mitigating circumstances exist that approach or exceed the weight given to the

---

[163] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[164] *Hall v. Florida, supra* note 62, 572 U.S. at 704.

[165] *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

[166] *State v. Hessler, supra* note 124.

aggravating circumstances, does not violate the 8th and 14th Amendments to the U.S. Constitution or article I, § 9, of the Nebraska Constitution.

## 6. Proportionality Review

[46] Lastly, Trail argues that because his crimes involved only one victim and one aggravator, the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases. Under Neb. Rev. Stat. § 29-2521.03 (Cum. Supp. 2020), we are required upon appeal to determine the propriety of a death sentence by conducting a proportionality review. Proportionality review requires us to compare the aggravating and mitigating circumstances with those present in other cases in which a district court imposed the death penalty.[167] This is to ensure that the sentence imposed in the case under review is no greater than those imposed in other cases with the same or similar circumstances.[168]

[47] We disagree with Trail's premise that the number of victims or the number of aggravating circumstances is determinative. We have emphasized that the balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting, but, rather, requires a careful weighing and examination of the various factors.[169] It would be virtually impossible to find two murder cases which are the same in all respects.[170] Instead, the question is simply whether the cases being compared are sufficiently similar, considering both the crime and the defendant, to provide the court with a useful frame of reference for evaluating the sentence in this case.[171]

---

[167] *State v. Mata, supra* note 165.

[168] See *id.*

[169] *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001).

[170] *State v. Schroeder, supra* note 12.

[171] *Id.*

[48] Accordingly, we have held that the death penalty can be imposed when only one aggravating circumstance is present.[172] Where the record reveals that the sentence of death was the result of reasoned judgment and the careful weighing and examination of the various circumstances and factors in light of the totality of the circumstances present, one aggravating circumstance may be sufficient under our statutory system for the sentencing court to conclude that imposition of the death penalty is appropriate.[173]

In our de novo review, we conclude that the requirements of Neb. Rev. Stat. §§ 29-2519 to 29-2546 (Cum. Supp. 2020) have been met. Trail does not contest that the State proved beyond a reasonable doubt the aggravating circumstance of exceptional depravity to justify the imposition of the death penalty. As the sentencing panel described, the murder reflected cold, calculated planning to find and kill a helpless victim to satisfy Trail's curiosity and sexual proclivities. The carvings on Sydney's body and other acts of strategic mutilation demonstrated he relished the murder and had "no regard for the life of Sydney . . . beyond his own personal pleasure." We find the aggravating circumstance of exceptional depravity is sufficient under the totality of the circumstances present to justify the death penalty for Trail.

Trail does not assert on appeal any mitigating circumstance. We agree with the sentencing panel that the nonstatutory mitigating circumstance of Trail's upbringing does not approach or exceed the aggravating circumstance.

We have reviewed our relevant decisions on direct appeal from other cases in which the death penalty was imposed and do not find the imposition of the death penalty is a greater penalty than the sentences imposed in other cases with similar circumstances. For example, in *State v. Joubert*, we affirmed the death penalty when, among other things,

---

[172] See, *id.*; *State v. Dunster, supra* note 169.

[173] *State v. Dunster, supra* note 169.

the defendant had "coldly planned"[174] "[the] murders far in advance . . . to satisfy his intellectual or sexual curiosity or urges."[175] Further, the murders in *Joubert* were "'totally and senselessly bereft of any regard for human life.'"[176] In *Mata*, in affirming the death penalty, we found it "sufficient to say that [the victim's] skull had been fractured by multiple blows of blunt force trauma at or near the time of death and that [the defendant] had dismembered [the victim's] body and disposed of it in pieces."[177] "[The defendant] had relished killing [the victim] with gratuitous violence and unnecessary mutilation."[178]

Our proportionality review, required by § 29-2521.03, is designed to ensure that no sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances and that the review should include only those cases in which the death penalty was imposed.[179] Like the defendant in *Joubert*, Trail coldly planned Sydney's murder to satisfy sexual urges. Like the actions of the defendant in *Joubert* and the defendant in *Mata*, Trail's mutilation and dismemberment of Sydney's body showed he relished the killing and was bereft of any regard for human life. The crime committed against Sydney was utterly senseless and cruel. The sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases. We uphold the sentencing panel's imposition of the death sentence.

## VI. CONCLUSION

For the foregoing reasons, we find no merit to Trail's assignments of error challenging the denial of his pretrial

---

[174] *State v. Joubert, supra* note 4, 224 Neb. at 432, 399 N.W.2d at 251.

[175] *Id*. at 430, 399 N.W.2d at 250.

[176] *Id.*

[177] *State v. Mata, supra* note 165, 275 Neb. at 30, 745 N.W.2d at 255.

[178] *Id*.

[179] See *State v. Joubert, supra* note 4.

motions to prevent death qualification of the jury and to sever the conspiracy and murder charges, the district court's orders during trial releasing Sydney's mother from sequestration after she testified and denying his motion for a mistrial based on his outburst involving self-harm, and the district court's denial of his motion for a new trial. Further, we reaffirm the constitutionality of the Nebraska death penalty statutes and find Trail's sentence of death was not excessive or disproportionate.

AFFIRMED.