IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. WILLIAMS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

AUSTIN R. WILLIAMS, APPELLANT.

Filed January 2, 2024.    No. A-22-776.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Austin R. Williams appeals his convictions of first degree sexual assault on a child, incest with a victim under 18 years of age, and third degree sexual assault on a child, following a jury trial in the district court for Douglas County. These convictions stem from the sexual abuse he inflicted on his stepdaughter, E.T.

Williams assigns the district court abused its discretion in denying two motions for mistrial he made after a witness indicated he had physically abused E.T. in addition to sexually abusing her. He also assigns the district court erred in overruling his objections to purported leading questions which elicited testimony necessary to prove two of the crimes he was charged with. Lastly, he assigns the cumulative prejudicial effects of these errors warrant a new trial. We affirm the judgment of the district court.

- 1 -

## II. BACKGROUND

### 1. WILLIAMS' SEXUAL ABUSE OF E.T.

Williams married E.T.'s mother, Erika, when E.T. was 5 years old. When E.T. was 9 or 10 years old, the three of them moved from Kearney to Fremont.

E.T.'s father, Jake, and stepmother, Julie, continued to live in Kearney. Pursuant to a custody agreement, E.T. would live in Fremont with Erika and Williams during the school year and visit Jake and Julie in Kearney every other weekend. This arrangement flipped during the summers, so E.T. would spend most of the summers in Kearney with Jake and Julie.

The first incident of sexual abuse occurred in 2017 when E.T. was 12 years old. E.T. was staying with Erika and Williams in Fremont and had been left to babysit her 8-year-old half-sister, A.V., while Erika and Williams went out separately for the night. Williams came home first and found E.T. lying on her bed while A.V. slept on the couch in the living room. After sitting on the bed with E.T. and kissing her on the cheeks, Williams put his tongue in her mouth and attempted to "make-out" with her. Williams then put his hand under her shirt and touched her breasts while whispering in her ear. He also attempted to reach inside her underwear, but E.T. resisted by moving away. He then prompted her to go upstairs with him several times, but she ignored his requests and he left the room.

Two weeks later, a similar incident happened. From that point on, E.T. reported that Williams would engage in this conduct two to three times a week. During these occurrences, Williams felt E.T.'s breasts, forced her to touch his penis, and penetrated her vagina with his fingers. He also cuddled with E.T. in his bed several times while he was naked. E.T. stated that these events happened so often, "it just seemed normal." The incidents occurred in her bed and in Williams' bed and happened regardless of whether Erika or A.V. were home. If Erika and/or A.V. were home, Williams would sexually assault E.T. after they were asleep, before they woke up in the morning, or on the couch while he and E.T. were covered with blankets. On several occasions, Williams subjected E.T. to this behavior while A.V. was sleeping in the same room.

When E.T. was 13 years old, Williams came into her room one morning and began to touch her breasts "like he usually did." With A.V. sleeping in another bed in the same room, he started to masturbate. He placed his semen covered fingers in E.T.'s mouth and asked, "Do you like that?" He then "push[ed] [her] head" toward his penis so she would "put [her] mouth on his penis." E.T. resisted this pressure and refused.

On another occasion, when E.T. was 13, Williams was rubbing "Biofreeze" on her legs after a volleyball camp. Williams had her take off her pants and lie on her stomach on the floor. While rubbing the Biofreeze on her legs, he moved her underwear to the side and tried to insert his penis in her. Upon feeling his penis, E.T. got up and walked away.

In July 2018, E.T., A.V., Williams, and Erika stayed at a hotel in Omaha, Nebraska. One morning while Erika and A.V. were still sleeping, Williams and E.T. cuddled on the couch. Williams touched E.T.'s breasts, whispered in her ear, and then touched her vagina over her shorts. He eventually moved her shorts over and touched the inside of her vagina with his fingers. He then pulled down his pants and tried to insert his penis. E.T. was not sure where he was trying to insert his penis but felt it on her butt. She reported that his penis did not enter anywhere because once she felt it, she moved away.

Following this incident, in August 2018, E.T. indicated to her paternal grandmother that she wanted to talk to a counselor. After Jake and Julie became aware of this, they took her to a counselor and she disclosed the first incident that occurred in 2017 when she was 12 years old. Based on this interview, the Nebraska State Patrol opened an investigation into Williams. E.T. testified that she finally reported the behavior "[b]ecause usually it just happened at our house. But the fact that it happened at a vacation . . . something inside me told me that this was never going to stop and it was only going to get worse and I couldn't escape it."

Around two months later, E.T. began therapy sessions with another counselor, Sarah Sanson, where she eventually disclosed the other incidents of sexual abuse. Sanson informed law enforcement of these disclosures. In January 2019, E.T. was interviewed by Kayla Farrell, a criminal investigator for the Nebraska State Patrol. During this interview, E.T. clarified what occurred during the July 2018 incident in Omaha. Farrell then conducted two more interviews with E.T. on March 15, 2019, and January 29, 2020. Williams was eventually charged in Dodge County in relation to the incidents that occurred in Fremont and was convicted of one count of third degree sexual assault of a child.

## 2. DOUGLAS COUNTY PROCEEDINGS

On September 28, 2020, Williams was charged in relation to the incident that occurred in Omaha. He was charged in Douglas County District Court with first degree sexual assault of a child, a Class IB felony; incest of a victim under the age of 18, a Class IIA felony; and third degree sexual assault of a child, a Class IIIA felony.

On March 30, 2021, Williams filed a motion in limine requesting the district court preclude the State from introducing any evidence concerning his other crimes, wrongs, or acts, particularly any evidence pertaining to the sexual assaults that occurred in Fremont, Dodge County, Nebraska. On January 25, 2022, the State filed a motion for notice of intent to offer evidence pursuant to Neb. Rev. Stat. §§ 27-404 and 27-414 (Reissue 2016).

On February 9, 2022, the district court held a hearing to decide whether the evidence of sexual abuse in Dodge County from 2016 to 2018 would be admitted under §§ 27-404 and 27-414. On March 21, the district court denied Williams' motion in limine and sustained the State's motion to introduce the prior Dodge County sexual assaults in the Douglas County trial under §§ 27-404 and 27-414.

Williams' trial began on July 18, 2022, and lasted 8 days. At trial, E.T. testified to the incidents described above. While E.T. was describing the Omaha hotel incident, the following exchange occurred:

> [E.T.]: So he was, like, feeling my vagina over my pants. And then the shorts were loose at the bottom, so he, like, moved my shorts over. And he then, like, pulled down his pants and tried to insert his penis.
>
> [STATE]: Where was he trying to insert his penis?
>
> [E.T.]: I'm not sure.
>
> . . .
>
> [STATE]: So where did his penis go?
>
> [E.T.]: He, like – it, like, touched, like, my butt, but, like, I moved away so that, like, nothing else happened after that.

[STATE]: And you say touched your butt, I want to talk about the crack of your butt a little bit. Did it go there?

[E.T.]: Yeah.

[STATE]: Where did you think he was trying to go with it?

[E.T.]: I'm not sure.

[STATE]: Did it enter anywhere?

[E.T.]: No.

[STATE]: Why not?

[E.T.]: Because the moment that I, like, felt it, I sat up right away and, like, moved.

[STATE]: What about his fingers, was he doing anything with his fingers?

[E.T.]: Not at – not right then, but before he was, like, touching over my pants.

[STATE]: Okay. So we skipped that. What did he do with his fingers?

[E.T.]: He was just, like, rubbing my vagina.

[STATE]: Inside your vagina?

[DEFENSE COUNSEL]: Objection: Leading, asked and answered.

THE COURT: Overruled.

[STATE]: Where did he touch you on your vagina?

[E.T.]: He touched me, like, over my pants, and then he, like, went through the, like, leg hole and was, like, touching me inside my vagina.

[DEFENSE COUNSEL]: Objection: Move to strike the answer based on a leading question that she'd already been asked and answered.

THE COURT: Overruled.

[STATE]: What do you mean by inside your vagina?

[E.T.]: Like, his fingers were rubbing on the vagina, like, inside of my vagina.

[STATE]: Do you know the different parts of your vagina, the words for them?

[E.T.]: No.

[STATE]: How do you know it was inside?

[E.T.]: Because it was, like, past the lips.

[STATE]: Okay. So lips you think of as a part of your vagina, that's a word you call them?

[E.T.]: Yeah.

[STATE]: And again, I know it's difficult. But just so we know what you're talking about, what do you mean by the lips?

[E.T.]: Just, like, the out – like, I don't know how to describe it.

[STATE]: You started to say the out, the outer part of your vagina?

[E.T.]: Yeah.

[STATE]: And did he get past those?

[E.T.]: Yeah.

Julie also testified at trial, but only two portions of her testimony are relevant to appellate issues in this case. The context in which the first topic arose related to numerous text messages Williams sent to E.T.

In June 2017, Jake and Julie took away E.T.'s iPod for several days and became concerned about the number of text messages she received from Williams over that period. Over the course of several days, Williams sent E.T. 50 to 60 messages. Julie found that amount to be "alarming" and thought it was odd he was texting her that much. She was also disturbed by the content of the messages, reporting that they made her "sick to [her] stomach." Williams told E.T. several times a day how much he loved her and described her as "the star in his sky." He also made comments about her breasts, how she needed new bras, and referred to himself as "the bra expert." While these messages concerned Jake and Julie, they spoke with E.T. and decided not to push the issue.

The next summer, in 2018, Julie noticed E.T. was still getting many messages from Williams. While discussing her concerns about the messages at trial, the following exchange occurred:

> [STATE]: When you started to get concerned by seeing these messages, what did you do? Did you ask [E.T.] about these things? You've asked one time. Did you ever ask – I don't know, get more aggressive about your asking?
>
> [JULIE]: I remember asking her twice. We asked after in 2017 when we first saw them. And then later in the summer of 2018, we were at lunch, and she was opening up to us and told us a time that [Williams] had hit her.
>
> [DEFENSE COUNSEL]: Objection. Relevance.

At this point, there was a sidebar outside the presence of the jury where the parties discussed Julie's comment that Williams had hit E.T. Defense counsel moved for a mistrial based on Julie's comment, arguing it constituted inadmissible § 27-404 evidence. After listening to the arguments of the parties, the district court denied the motion for mistrial. However, the court informed defense counsel that she could make a better record during a break. Once the jury returned, the court gave the following admonishment: "Ladies and gentlemen, the Court would simply ask you to disregard the last statement you heard from the witness. Next question."

The State continued its direct examination of Julie and inquired about E.T.'s referral to counseling. Julie testified that she called a counselor named Susan Athy and the following exchange occurred:

> [STATE]: Did something change that you actually did not ever get [E.T.] to Susan Athy?
>
> [JULIE]: So when I talked to Susan, she asked what she needed a counselor for. And I said I don't know, but Jake and I have concerns about the relationship with [Williams].
>
> [STATE]: Did you say your concerns were actually sexual in nature?
>
> [JULIE]: I said she gets text messages that come off more like a boyfriend. And I said we were aware of some physical --
>
> [STATE]: Okay. You were --
>
> [DEFENSE COUNSEL]: Judge, move to strike.

This prompted another sidebar outside the presence of the jury where defense counsel again moved for a mistrial citing Neb. Rev. Stat. §§ 27-401, 27-403, and 27-404 (Reissue 2016). The district court took the second motion under advisement and stated it would address the matter later

but reiterated that the first motion had been denied. Defense counsel did not ask the district court to instruct the jury to disregard the end of Julie's last comment.

At the next break, the parties addressed Williams' second motion for mistrial outside the presence of the jury. The court denied the second motion for mistrial and allowed defense counsel to renew the motion at a later time.

The following morning, Williams renewed his second motion for mistrial, which the court denied. Later that day, the district court advised the parties that it would consider a limiting instruction to the jury on the motion for mistrial if the parties desired. Defense counsel responded that a limiting instruction would not cure the prejudice and they did not want to bring further attention to the issue.

On July 27, 2022, the jury found Williams guilty of all the charges: first degree sexual assault of a child, incest of a victim under age 18, and third degree sexual assault of a child. On August 2, Williams filed a motion for new trial which the court denied on August 29. On October 5, Williams was sentenced to 40 to 45 years' imprisonment on count 1, which included a 15-year mandatory minimum; 15 to 20 years' imprisonment on count 2; and 2 to 3 years' imprisonment on count 3. The sentences were ordered to be served concurrently.

## III. ASSIGNMENTS OF ERROR

Williams assigns the district court erred in (1) denying his motion for a mistrial following Julie's comment that E.T. "open[ed] up" that Williams "had hit her," (2) denying his second motion for mistrial following Julie's comment that she was "aware of some physical" and by failing to strike the comment, and (3) overruling his leading question objections, motion to strike, and motion to reconsider following E.T.'s testimony regarding vaginal penetration. Lastly, Williams assigns the cumulative prejudicial effect of these errors necessitates a new trial.

## IV. STANDARD OF REVIEW

An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

An appellate court reviews a trial court's allowance of leading questions for an abuse of discretion. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

## V. ANALYSIS

### 1. MOTIONS FOR MISTRIAL

Williams' first and second assignments of error allege the district court erred in denying his motions for mistrial. A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Trail, supra.* A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. *Id.* The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.* In the context of denying a motion for mistrial, actual prejudice means a reasonable probability sufficient to undermine confidence in the outcome. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d

531 (2006). Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). Absent evidence to the contrary, the legal system presumes that jurors, to the extent they are able, will comply with curative instructions and judicial admonitions. *State v. Trail, supra.*

A trial court is vested with considerable discretion in passing on motions for mistrial and new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). It is an abuse of discretion to make an error of law or clear errors of factual determination. *State v. Trail, supra.*

### (a) First Motion for Mistrial

Williams first assigns the district court erred in not granting his motion for mistrial following Julie's comment that E.T. "open[ed] up" to her that Williams "had hit her." Williams argues this testimony was inadmissible character evidence under § 27-404, inadmissible hearsay evidence under Neb. Rev. Stat. § 27-802 (Reissue 2016), and that its probative value was substantially outweighed by its prejudicial effect under § 27-403. He also asserts this testimony impermissibly bolstered E.T.'s credibility and associated Williams' sexual abuse charges with dissimilar child abuse allegations. He further contends the prejudice imposed by this testimony cannot be resolved by an admonishment so its insertion at trial warranted a mistrial even though the jury was instructed to disregard the comment.

We first note that the conformity of Julie's statement with the Nebraska Rules of Evidence is not before us. Her comment was objected to and although the district court never formally sustained that objection, the court instructed the jury to disregard her statement. Therefore, we need not decide whether her testimony violated any applicable rules of evidence. Instead, the question before us is whether the court abused its discretion in finding that the damaging effect of her statement could be removed by proper admonishment. In that regard, Williams argues the prejudicial effect of the testimony could not be cured by admonishment because it improperly bolstered E.T.'s credibility and irretrievably associated Williams' sexual abuse charges with dissimilar child abuse allegations.

Williams argues that Julie's use of the phrase "opening up" improperly bolstered E.T.'s credibility because it indicated that E.T. was sharing secret information which led the jury to implicitly apply a heightened level of trust to her statement. The Nebraska Supreme Court has stated that "[I]t is totally improper for one witness to testify as to the credibility of another witness [because the] question of any witness' credibility is for the jury." *State v. Rocha*, 295 Neb. 716, 733, 890 N.W.2d 178, 195 (2017). Because making credibility determinations is the role of the trier of fact, testimony that usurps that role is not helpful and thus is improper opinion testimony under Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 2016). *State v. Rocha, supra.*

We do not believe that the mere usage of the phrase "opening up" amounts to credibility bolstering. We first note that the testimony at issue does not facially concern anyone's credibility. Williams' argument relies on an assumption that a fact finder will give greater weight to statements

they perceive as being secret. Beyond our initial skepticism of whether that is true, any effect the secrecy of a statement has on a trier of fact is to be determined by that fact finder. In other words, we do not believe that all fact finders would view the revelation of secret information as inherently more trustworthy. While some may grant such statements more credibility, others may do the opposite. In that regard, the determination of whether such a statement is credible is still solely placed with the trier of fact and does not universally bolster credibility. Therefore, we do not find that the testimony at issue constitutes credibility bolstering.

Williams next argues Julie's testimony caused actual prejudice because it conflated his sexual abuse charges with allegations of child abuse. His argument relies on the Supreme Court's decision in *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013), which found that prejudice occurs when physical child abuse charges are improperly joined with sexual abuse charges. In *Rocha*, the defendant was charged with one count of first degree sexual assault of a child and four counts of child abuse. At the trial, evidence was adduced that Rocha sexually abused his 8-year-old stepdaughter and physically abused all four of his stepchildren. *Id*. Rocha forced his stepdaughter to perform oral sex on him multiple times, touched her vagina, and penetrated her bottom with his penis. *Id.* Additionally, he hit the other children with belts, strangled one "by dragging him up in the wall," choked another in the bathroom, and pushed one of their heads into a wall. *Id.* at 259, 836 N.W.2d 777-78. The children also reported that they often did not get enough to eat. *Id.*

In finding that the defendant suffered prejudice as a result of his trial counsel failing to object to the misjoinder of these charges and failing to move to sever them, the Supreme Court stated:

> Because the charges were misjoined under § 29–2002(1), evidence of both the alleged sexual assaults and the child abuse of the other children was admitted in the joint trial. But had the charges been tried separately, evidence of the child abuse regarding the other children would have been inadmissible in a trial on the sexual assault charge, and vice versa, under Neb. Rev. Stat. § 27–404(2). . . . Trying the sexual assault and child abuse charges together also essentially prohibited Rocha from moving to exclude prejudicial evidence based on Neb. Rev. Stat. § 27-403. . . . The risk of undue prejudice, considering the type of evidence at issue, was high; evidence of sexual assault, by its nature, was highly volatile and had the potential to fan the jury's emotions. That risk was exacerbated by the fact that the court did not specifically instruct the jury on the importance of keeping the charges, and evidence related to those charges, separate during its deliberations. For these reasons, our confidence in the outcome of this case is undermined and we conclude that Rocha was prejudiced by his trial counsel's deficient performance.

*State v. Rocha*, 286 Neb. at 269-71, 836 N.W.2d at 784-85.

Williams essentially relies on this decision to support a proposition that would necessitate a per se finding of actual prejudice whenever evidence of physical child abuse is introduced during a trial involving child sexual abuse charges, or vice versa. We do not believe that the *Rocha* decision supports that conclusion. Instead, the *Rocha* decision found that such charges should not be joined in the same trial because doing so prejudices a defendant's ability to preclude the introduction of evidence that would otherwise be inadmissible under §§ 27-403 and 27-404. Because joining the charges in the same trial allowed the jury in *Rocha* to see substantial evidence

that the defendant not only committed physical child abuse, but also sexual abuse of a child, the prejudice he suffered was readily apparent.

That is distinguishable from the current situation where there is not a conflation of sexual abuse and child abuse charges because Williams was not charged with child abuse. Without a co-mingling of those charges in the present matter, §§ 27-403 and 27-404 operate normally to bar unrelated or prejudicial evidence of child abuse. With the normal operation of these rules, the volume of evidence at issue in the current matter demonstrates its distinction from *Rocha*. While the jury in *Rocha* saw significant evidence of both sexual and physical abuse, this case has only fleeting references to possible physical abuse. Therefore, because our matter does not pose the facial risks of prejudice that occurs when sexual abuse and child abuse charges are joined together, the *Rocha* holding does not control the outcome.

The question before us remains whether Williams was actually prejudiced by Julie's testimony. In the context of denying a motion for mistrial, actual prejudice means a reasonable probability sufficient to undermine confidence in the outcome. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006). Therefore, we must decide whether the district court abused its discretion in finding that the potential prejudice inflicted by Julie's insertion of inadmissible character evidence at trial could be cured by admonishing the jury to disregard the statement. In some cases, the damaging effect of an event during trial may be such that it cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015). However, the Supreme Court has indicated that fleeting or unsolicited remarks by a witness regarding a defendant's previous crimes are not typically the type of errors that cannot be cured by admonishment. *Id.*

We find that Julie's testimony did not actually prejudice Williams. In deciding this issue, we must first assume that the jury followed the district court's instruction and disregarded the answer. See *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022). Under that presumption, any prejudice incurred by Julie's testimony was cured by the court's admonishment. But even if we did not make that assumption, given the other evidence offered at trial, we do not believe there is a reasonable probability that her brief unsolicited comment influenced the outcome of the case to the degree that the entire proceeding was tainted. Accordingly, we find the district court did not abuse its discretion in denying Williams' first motion for mistrial.

(b) Second Motion for Mistrial

Williams' second assignment of error concerns Julie's incomplete statement that she was "aware of some physical." Williams assigns the district court erred in not striking this statement and denying his second motion for mistrial.

We first find that Williams waived the issue concerning his motion to strike the comment. The onus is on the movant to insist upon a ruling below before bringing the issue to the appellate courts. *State v. Gill*, 297 Neb. 852, 901 N.W.2d 679 (2017). Because Williams' counsel did not ask the court to instruct the jury to disregard the comment at the time the comment was made, the issue was waived. More so, when discussing Williams' second motion for mistrial the following morning, Williams' counsel declined the district court's offer to request an admonishment or limiting instruction regarding Julie's statement. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *Ecker v. E &*

*A Consulting Group*, 302 Neb. 578, 924 N.W.2d 671 (2019). Accordingly, Williams cannot now assert the court erred in not striking the testimony when he denied the court's offer to admonish the jury or provide a limiting instruction.

Williams next argues the district court abused its discretion in denying his second motion for mistrial because Julie's statement constituted improper character evidence that, when conjoined with her prior comment that Williams had hit her, clearly indicated that he physically abused E.T. In turn, the State disagrees that Julie's remark constitutes character evidence because her response was cut-off and she never completed what she intended to say. In this sense, the State argues it is "pure conjecture" that the jury could only see this testimony as further evidence that Williams physically abused E.T. Brief for appellee at 28.

Even when considering Julie's prior comment, we do not believe her incomplete statement that she "was aware of some physical" constitutes character evidence. Because she was interrupted before she could finish her sentence, it is impossible to know for certain what she was going to say. As such, any attempt to decipher what her next words were going to be is a purely speculative exercise. As the Supreme Court has stated, "we will not presume prejudice based on mere speculation." *State v. Sandoval*, 280 Neb. 309, 324, 788 N.W.2d 172, 194 (2010). Accordingly, we find the district court did not abuse its discretion in denying Williams' second motion for mistrial.

## 2. LEADING QUESTIONS

Williams next assigns the district court erred in overruling his leading question objections, motion to strike, and motion to reconsider following E.T.'s testimony regarding vaginal penetration. The exchange at issue is as follows:

> [THE STATE]: What about his fingers, was he doing anything with his fingers?
> [E.T.]: Not at – not right then, but before he was, like, touching over my pants.
> [THE STATE]: Okay. So we skipped that. What did he do with his fingers?
> [E.T.]: He was just, like, rubbing my vagina.
> [THE STATE]: Inside your vagina?
> [DEFENSE COUNSEL]: Objection. Leading, asked and answered.
> THE COURT: Overruled.
> [THE STATE]: Where did he touch you on your vagina?
> [E.T.]: He touched me, like, over my pants, and then he, like, went through the, like, leg hole and was, like, touching me inside my vagina.
> [DEFENSE COUNSEL]: Objection: Move to strike the answer based on a leading question that she'd already been asked and answered.
> THE COURT: Overruled.

Williams takes issue with the two questions posed by the State which resulted in E.T. testifying that Williams penetrated her vagina: "Inside your vagina?" and "Where did he touch you on your vagina?" Williams suggests that without these purported leading questions, E.T. would not have offered testimony of penetration which was necessary to prove two of the counts he was charged with, first degree sexual assault of a child and incest with a victim under 18 years of age.

The State argues only one of these purported leading questions is at issue because the first question, "Inside your vagina?" was never answered. It then asserts that the second question, "Where did he touch you on your vagina?", is not a leading question because it does nothing to suggest a desired response. Lastly, the State denied Williams' proposition that it would have been unable to prove the element of penetration without the testimony elicited from these questions.

Neb. Rev. Stat. § 27-611(3) (Cum. Supp. 2022) states that "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." In general, a question is leading when it is so framed as to suggest to the witness the answer which is desired of them. *State v. Hoffmeyer*, 187 Neb. 701, 193 N.W.2d 760 (1972). Conversely, a question is not leading where it does not in any way indicate or suggest the answer desired. *Id.* It is well-settled that a trial court in a criminal case has a large, though not unlimited, discretion in granting or refusing permission to ask a witness a leading question. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Appellate courts review a trial court's allowance of leading questions for an abuse of discretion. *Id.*

We first find that even if the district court erred in overruling Williams' objection to the first question, "Inside your vagina?", that error was harmless because the question was never answered by the witness. See *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003) (finding harmless error when answer to improper question was not prejudicial); see, also, *State v. Robinson*, 662 S.W.3d 120 (Mo. Ct. App. 2023) ("questions are not evidence, and even improper questions are generally not prejudicial if left unanswered."); *Clark v. State*, 715 N.W.2d 768 (Iowa Ct. App. 2006) ("Ordinarily, simple asking of questions is not prejudicial[.]"). Because the first question was never answered, Williams was not prejudiced by the court's overruling of his objection.

We next find the second question, "Where did he touch you on your vagina?" was not a leading question. While this question was narrow in scope, it did not presuppose the answer. It was open-ended and in no way directed E.T. to discuss penetration specifically. As such, we conclude that the district court did not abuse its discretion in overruling Williams' leading question objections. Nor did it abuse its discretion when it was invited to reweigh its decision by Williams' motion to reconsider.

### 3. CUMULATIVE ERROR

Williams next assigns the cumulative weight of these purported errors necessitates a new trial. "[A]lthough one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his constitutional right to a public trial by an impartial jury." *State v. Smith*, 292 Neb. at 470, 873 N.W.2d at 199. As discussed, for each of Williams' assigned errors, we find the court either did not abuse its discretion or that he did not suffer actual prejudice from the error. As such, we find that there is no cumulative error that warrants a new trial.

### VI. CONCLUSION

We conclude that the district court did not abuse its discretion in denying Williams' two motions for mistrial. We also conclude that Williams waived the issue concerning the court not striking Julie's comment about being "aware of some physical." We further conclude that the court

- 11 -

did not abuse its discretion in overruling Williams' leading question objections and motion to reconsider because there was no prejudice suffered as a result of the first purported leading question and the second purported one was not leading. With these findings, we finally conclude there is no cumulative error that warrants a new trial. Accordingly, Williams' convictions are affirmed.

AFFIRMED.